No. 99-410

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 55

298 Mont. 438

995 P. 2d 1002

ALVIN K. PHILLIPS, as Personal

Representative of the Estates of

TIMOTHY BYRD, DARRELL L.

BYRD, and ANGELA BYRD, deceased,

and as Guardian of SAMUEL BYRD,

minor child,

Plaintiffs,

v.

GENERAL MOTORS CORPORATION,

Defendant.

CERTIFIED QUESTION: United States District Court,

District of Montana.

COUNSEL OF RECORD:

For Plaintiffs:

James H. Goetz (argued) and Robert K. Baldwin, Goetz, Gallik, Baldwin &

Dolan, P.C.; Bozeman, Montana

James E. Butler, Jr. and Peter J. Daugherty, Butler, Wooten, Overby,

Pearson, Fryhofer & Daugherty; Columbus, Georgia

Christopher P. Christian, Hutton & Hutton; Wichita, Kansas

For Defendant:

Jay P. Lefkowitz (argued), Kirkland & Ellis; Washington, D.C.

William Evan Jones, Garlington, Lohn & Robinson; Missoula, Montana

For Amicus:

William A. Rossbach, Rossbach Brennan, P.C.; Missoula, Montana

Jeffrey P. Foote, Attorney at Law; Portland, Oregon

Dennis M. Mestas, Attorney at Law; Anchorage, Alaska

Submitted and Argued: January 20, 2000

Decided: March 7, 2000

Filed:

Clerk

Justice Jim Regnier delivered the opinion of the Court.

¶1. The United States District Court for the District of Montana, Missoula Division, has certified the following questions to this Court pursuant to Rule 44, M.R.App.P.

¶2. Whether, in a personal injury/product liability/wrongful death action, where there is a potential conflict of laws, Montana will follow the Restatement (Second) of Conflict of Laws, including the "most significant relationship" test set forth in §§ 146 and 6, in the determination of which state's substantive law to apply?

¶3. Given the facts of this case, which state's law applies to plaintiff's various tort and damages claims under Montana's choice of law rules?

¶4. Does Montana recognize a "public policy" exception that would require application of Montana law even where Montana's choice of law rules dictate application of the laws of another state, and would such an exception apply in this case?

¶5.Our response to the certified questions can be simply stated. We adopt the Restatement (Second) of Conflict of Laws for tort actions. Under the analysis contained in the Restatement (Second) of Conflict of Laws, we conclude that given the facts as presented in the District Court's Order, the laws of Montana apply. Lastly, considerations of public policy are accounted for under the analysis contained in the Restatement (Second) of Conflict of Laws.

## FACTUAL BACKGROUND

¶6.In its Order certifying these questions to the Supreme Court of Montana, the District Court submitted a statement of agreed facts. We stated in our Order accepting the certified questions that the facts of this case are restricted to those set forth in the certifying order. The following facts have been agreed upon by the parties for purposes of certification:

¶7.The vehicle which is the subject of this action was a 1985 Chevrolet pickup. The vehicle was originally sold by General Motors in North Carolina. Darrell Byrd subsequently purchased the pickup in or about February 1995 from Mike's Wholesale Cars in Newton, North Carolina. In doing so, he supplied a North Carolina address. The 1985 Chevrolet pickup truck was designed, tested, manufactured, and distributed by General Motors. The subject vehicle had fuel tanks mounted outside the frame rail.

¶8.On December 22, 1997, Darrell Byrd was driving with his family in the 1985 Chevrolet pickup truck from their home near Fortine, Montana, where Darrell Byrd was employed and where Timothy and Samuel Byrd attended school. The purpose of the trip was to spend Christmas vacation with family in North Carolina. The Byrds were domiciled in

Montana before and at the time of the 1997 accident.

¶9. The wreck and fire which form the basis of this action occurred on December 22, 1997, on Interstate 70 near Russell, Kansas. A 1997 International semi-tractor trailer driven by Betty J. Kendall collided with the subject 1985 Chevrolet pickup truck driven by Darrell Byrd. A fire ensued. Darrell, Angela, and Timothy Byrd died. Samuel Byrd sustained personal injuries which required emergency treatment and hospitalization.

¶10. Before and at the time of the 1997 accident, Samuel, Timothy, Darrell, and Angela Byrd were Montana residents. The deceased, Darrell and Angela Byrd, were respectively the father and mother of the deceased, Timothy Byrd. Timothy was 13 years of age at the time of his death. Samuel Byrd, who survived the accident is also the son of the deceased, Darrell and Angela Byrd, and was 11 years old at the time of the 1997 accident.

¶11. Plaintiff Alvin Phillips is the legal guardian of Samuel Byrd and the personal representative of the estates of Angela Byrd, Darrell Byrd, and Timothy Byrd. Alvin Phillips resides in Newton, North Carolina. Samuel Byrd presently resides in North Carolina. Probate proceedings for the Estates of Timothy, Angela, and Darrell Byrd are filed with and pending in the Montana Nineteenth Judicial District Court, Lincoln County, Montana.

¶12. In these product liability cases, in which Plaintiffs raise claims of negligence and strict liability, Plaintiffs seek compensatory and punitive damages related to the deaths of Darrell, Angela, and Timothy Byrd and the personal injuries sustained by Samuel Byrd. General Motors denies all liability.

¶13. According to the District Court's Order, the parties disagree about the substantive law that should be applied to this case. "To determine the applicable law, a federal district court is to apply the choice of law rules of the state in which it sits." *Federal Ins. Co. v. Scarsell Bros., Inc.* (9th Cir. 1991), 931 F.2d 599, 602. Montana does not have a statutory provision governing choice of law nor has this Court reached a choice of law issue in a case involving conflicting tort rules. *See In re Mower*, 1999 MT 73, ¶ 27, 294 Mont. 35, ¶ 27, 979 P.2d 156, ¶ 27. Absent a definitive determination of Montana's choice of law rule in tort cases, federal judges for the District of Montana have applied the "most significant relationship" test of the Restatement (Second) of Conflict of Laws. *See, e.g., O'Neal v. Koehring Bomag* (J. Battin, 1995), 19 Mont. F. Rptr. 366.

¶14.The District Court observed that the instant case raised significant policy questions involving Montana's choice of law rules, that choice of law questions in tort cases are frequent in diversity litigation in federal court, and that it would be helpful in resolving this case and others to have a definitive determination of what the Montana choice of law rule is.

QUESTION ONE

¶15.Whether, in a personal injury/product liability/wrongful death action, where there is a potential conflict of laws, Montana will follow the Restatement (Second) of Conflict of Laws, including the "most significant relationship" test set forth in §§ 146 and 6, in the determination of which state's substantive law to apply?

¶16.The traditional choice of law rule, known as *lex loci delicti commissi* (or the law of place where the wrong was committed), provides that the infliction of injury is actionable under the law of the state in which it was received. *See Alabama Great S. R.R. Co. v. Carroll* (Ala. 1892), 11 So. 803, 805. In *Carroll*, the plaintiff, a resident of Alabama employed by the Alabama Great Southern Railroad Company, an Alabama corporation, was injured when, because of the negligence of his fellow employees occurring in Alabama, a link between two freight cars broke in Mississippi. Carroll brought suit in Alabama. Although Alabama law recognized a cause of action for injuries caused by the negligence of fellow employees, Mississippi did not. Following the traditional rule, the Supreme Court of Alabama applied the law of the place of injury, Mississippi, despite the fact that the conduct giving rise to Carroll's injury occurred in Alabama, both Carroll and his employer were from Alabama, and the relationship between the parties was based on an employment contract entered into in Alabama.

¶17.The theoretical basis for the traditional rule was the "vested rights" theory propounded by Joseph H. Beale. The theory explained the forum's use of foreign legal rules in terms of the creation and enforcement of vested rights. According to Professor Beale's theory, the only law that can operate in a foreign territory is the law of the foreign sovereign. When an event occurred in a foreign territory (an injury caused by a defective product, for example), and under the laws of that territory that event gave rise to a right (damages), a right "vested" under that territory's law. The role of the forum court was simply to enforce the right which had vested in the foreign territory according to that territory's law. Crucial to this theory was a determination of where and when a right vested, because the law in place where the right vested would control the existence and content of the right. As

evidenced by the decision in *Carroll*, courts have held that for tort claims a right vested where and when an injury occurred. *See* William M. Richman & David Riley, *The First Restatement of Conflict of Laws on the Twenty-fifth Anniversary of its Successor: Contemporary Practice in Traditional Courts*, 56 Md. L. Rev. 1196, 1197 (1997).

¶18. Traditional practice depends on a few broad, single-contact, jurisdiction-selecting rules. Traditionalist courts find the location of the last event necessary for a right to vest and apply the law of that location. As a result, courts following the traditional approach often choose the law of a state with no interest in the resolution of the dispute, like the choice of Mississippi law in *Carroll*. *See* Richman & Riley, *supra*, at 1198.

¶19. The traditional rule has largely been justified on the basis of the practical advantages that it offers: certainty, predictability, and forum neutrality. *See* Richman & Riley, *supra*, at 1200. However, problems inherent in its application as well as escape devices used to avoid results perceived to be arbitrary or unfair have greatly diminished the advantages the traditional rule supposedly provides. For example, the explicit public policy exception to the *lex loci* rule allows courts to avoid the law of the place of injury by concluding that it violates the public policy of the forum. Use of the public policy escape device by *lex loci* courts continues today. Observers have noted:

It is impossible to predict which issues will prompt a court to use the public policy escape. Surprisingly, courts in both Tennessee and Georgia, for instance, held that the failure to adopt strict liability in tort by the state in which the injury occurred (relying instead on negligence and warranty) was sufficiently crucial as to violate fundamental forum public policy.

Richman & Riley, *supra*, at 1228.

¶20. The traditional rule also no longer affords consistency and predictability across jurisdictions. While some jurisdictions still cling to the traditional rule, the vast majority of states have rejected it. At the end of 1998, only 11 states still adhered to the *lex loci* rule, and their continued adherence is questionable. *See* Symeon C. Symeonides, *Choice of Law in the American Courts in 1998: Twelfth Annual Survey*, 47 Am. J. Comp. L. 327, 331. Professor Symeonides observes:

As the century draws to a close, the traditional theory in tort and contract conflicts in the United States finds itself in a very precarious state. This assessment is based not simply on

the relatively low number of states that still adhere to that theory, but also on the shallowness of their commitment to it. Although the degree of commitment varies from state to state, it is fair to say that very few of these states are philosophically committed to the traditional theory. . . . More often, these rules remain in place only because [a] court is able to find a way to evade them by using one of the traditional escapes, such as characterization, substance versus procedure, renvoi, or, more often, the [public policy] exception.

Symeonides*, supra,* at 345.

¶21.The Restatement (Second) of Conflict of Laws largely abandoned the traditional rule in favor of an approach which seeks to apply the law of the state with the "most significant relationship to the occurrence and the parties." Restatement (Second) of Conflict of Laws § 145(1) (1971) (hereinafter "Restatement (Second)"). In adopting a policy analysis approach, the drafters noted that "[e]xperience has shown that the last event rule does not always work well. Situations arise where the state of the last event (place of injury) bears only a slight relationship to the occurrence and the parties with respect to the particular issue." Restatement (Second), Introductory Note to Ch. 7, at 412.

¶22.In abandoning the *lex loci* rule in favor of the most significant relationship test, one court observed:

The majority of courts which have considered the question have abandoned the *lex loci* rule in favor of a more flexible approach which permits analysis of the policies and interests underlying the particular issue before the court. Additionally, the commentators are overwhelmingly opposed to its retention and, although they disagree as to a substitute approach, all advocate a method which allows Courts to focus on the policies underlying the conflicting laws . . . and the governmental interests which would be advanced by their application.

*In re Air Crash Disaster at Boston, Mass. on July 31, 1973 (D. Mass. 1975), 399 F. Supp. 1106, 1110.*

¶23.In determining the choice of law rules for contract disputes, we adopted the approach contained in the Restatement (Second) of Conflict of Laws. *See Casarotto v. Lombardi* (1994), 268 Mont. 369, 886 P.2d 931, *rev'd sub nom. on other grounds, Doctor's Assocs., Inc. v. Casarotto* (1996), 517 U.S. 681, 116 S. Ct. 1652, 134 L. Ed. 2d 902, *reaff'd on reh'g, Casarotto v. Lombardi* (1995), 274 Mont. 3, 901 P.2d 526. We see no reason to

have one choice of law approach for contracts and another for torts. For the reasons set forth above, we now hereby adopt the "most significant relationship" approach to determine the applicable substantive law for issues of tort.

## QUESTION TWO

¶24.Given the facts of this case, which state's law applies to plaintiff's various tort and damages claims under Montana's choice of law rules?

¶25.The Byrds claim that under the most significant relationship test Montana law applies. General Motors contends that under this same test, the law of Kansas applies. We agree with the Byrds.

¶26.At the outset, we note that many appellate courts that have analyzed the most significant relationship test have done so in a fairly conclusory fashion. Although the analysis that follows appears somewhat tedious, our attempt is to comply with the procedures set forth in the Restatement (Second) of Conflict of Laws. We also raise an additional caveat. Any analysis under the Restatement approach is necessarily driven by the unique facts, issues, applicable law, and jurisdictions implicated in a particular case.

¶27.A. Relevant Restatement Provisions.

¶28.Any conflict of law analysis under the Restatement must begin with § 6. Section 6 provides:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) Where there is no such directive, the factors relevant to the choice of the applicable rule of law include:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of a particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability, and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

¶29.Since we have no statutory directive regarding choice of law, we turn to the specific section that relates to tort and personal injury actions. Section 145 of the Restatement (Second) of Conflict of Laws provides:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation, and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

¶30.The Restatement also has more specific sections relating to personal injury and wrongful death actions. Sections 146 and 175 provide that the rights and liabilities of the parties are to be determined in accordance with the law of the state where the injury occurred unless, with respect to a particular issue, another state has a more significant relationship. Whether another state has a more significant relationship is determined under § 145(2). We further note that issues such as the tortious character of conduct, available

defenses, contributory fault, and damages are all to be determined by applying the most significant relationship rule of § 145. *See, e.g.,* Restatement (Second) §§ 156 ("Tortious Character of Conduct"), 157 ("Standard of Care"), 161 ("Defenses"), 164 ("Contributory Fault"), and 171 ("Damages").

¶31.B. Most Significant Relationship Analysis.

¶32.Under the Restatement (Second) approach, the local law of the place of injury, Kansas, is presumptively applicable in a product liabilty and wrongful death action unless, with respect to a particular issue, a different state has a more significant relationship. *See* Restatement (Second) §§ 146 and 175. In order to determine whether a state other than the place of injury has a more significant relationship, the contacts listed under § 145(2) "are to be taken into account in applying the principles of § 6." Restatement (Second) § 145(2). Accordingly, we shall address each of the factors enumerated under § 6(2), taking into account, when appropriate, the contacts of § 145(2).

¶33.. Needs of the Interstate and International System.

¶34.The first factor we must consider under § 6(2) is the needs of the interstate and international system. Restatement (Second) § 6(2)(a). The drafters stated,

Choice-of-law rules, among other things, should seek to further harmonious relations between states and to facilitate commercial intercourse between them. In formulating rules of choice of law, a state should have regard for the needs and policies of other states and of the community of states. Rules of choice of law formulated with regard for such needs and policies are likely to commend themselves to other states and to be adopted by these states

Restatement § 6 cmt. d.

¶35.On the facts of this case, this factor does not point toward the importance of applying any particular state's law. Rather, this factor supports the application of the Restatement approach, namely the law of the state with the most significant relationship to an issue. We believe the Restatement approach fosters harmonious relationships between states by respecting the substantive law of other states when those states have a greater interest in the determination of a particular issue litigated in a foreign jurisdiction. The Restatement approach is preferable, in our view, to the traditional *lex loci* rule which applies the law of

the place of the accident which may be fortuitous in tort actions. We further conclude that there is no need to evaluate the contacts listed in § 145 to this issue.

¶36.. The Policies of Interested States.

¶37.The second and third factors we must consider are the relevant policies of the forum state and other interested states. *See* Restatement (Second) § 6(2)(b) and (c). In the case *sub judice*, these are the most important factors in our analysis. The drafters stated,

Every Rule of Law, whether embodied in a statute or in a common law rule, was designed to achieve one or more purposes. A court should have regard for these purposes in determining whether to apply its own rule or the rule of another state in the decision of a particular issue. If the purposes sought to be achieved by a local statute or common law rule would be furthered by its application to out-of-state facts, this is a weighty reason why such application should be made.

Restatement (Second) § 6 cmt. e. This principle requires us to consider whether applying the law of a state with a relevant contact would further the purpose that law was designed to achieve. Upon consideration of this principle, it is clear that Montana has the more significant relationship to the issues raised by this dispute for the reasons set forth below.

¶38. Place of Injury.

¶39.As noted above, in product liability and wrongful death actions, the law of the place of injury is presumptively applicable unless another state has a more significant relationship. *See* Restatement (Second) §§ 146 and 175. The injury here occurred in Kansas. Kansas law provides for a cause of action against a manufacturer whose product causes harm as a result of its defective design. *See* Kan. Stat. Ann. § 60-3302. The purpose of a state's product liability statute is to regulate the sale of products in that state and to prevent injuries incurred by that state's residents due to defective products. *See Thorton v. Sea Quest, Inc.* (N.D. Ind. 1998), 999 F. Supp. 1219, 1223-24 (noting that a state has an interest in compensating its citizens who are victims of torts and preventing the sale of supposedly defective products within its borders). Any conduct the state of Kansas may have been attempting to regulate through § 60-3302 could not be implicated by the facts of this case as it involves neither a sale in Kansas nor an injury to a Kansas resident.

¶40.Kansas law provides for multiple defenses to a product liability claim. For example,

Kansas law bars recovery for injuries occurring after "the time during which the product would be normally likely to perform or be stored in a safe manner." Kan. Stat. Ann. § 60-3303(a)(1). Kansas law also allows a party defending a product liability claim to assert that the injury causing aspect of the product was in compliance with the regulatory standards relating to design or performance at the time of manufacture. *See* Kan. Stat. Ann. § 60-3304(a). Once again, the overriding purpose of Kansas's product liability laws is to establish the level of safety of products sold either in Kansas or to a Kansas resident. Clearly, these rules regarding defenses were not enacted in order to grant a defense to a manufacturer when a non-Kansas resident is injured by a product not purchased in Kansas.

¶41.Under Kansas law, an award of damages for product liability may be diminished in proportion to the amount of negligence attributed to the plaintiff or decedent. *See Kennedy v. City of Sawyer* (Kan. 1980), 618 P.2d 788, 798 (holding that Kansas's comparative negligence statute is applicable in product liability actions). General Motors asserts that the issue of comparative negligence turns upon conduct that occurred in Kansas and therefore Kansas law should apply because Kansas has an interest in regulating conduct which occurred within its borders. However, the record before us does not contain the substance of General Motors' allegations regarding the Byrds' allegedly negligent conduct. Therefore, there is no evidence that General Motors' allegations concerning the comparative negligence of the Byrds are limited to conduct occurring solely within Kansas.

¶42.Moreover, even if General Motors' allegations concerned conduct occurring solely in Kansas, the Kansas Supreme Court did not extend Kansas's comparative negligence statute to product liability causes of action in order to regulate conduct occurring in Kansas. In concluding that the comparative negligence statute applied to product liability actions, the Kansas Supreme Court stated:

*Comparative liability provides a system for allocating responsibility for an injury while still serving the social policy of not allowing a manufacturer or seller to escape liability for defective products merely because of slight culpability on the part of the product user in bringing about the injury.*

*Kennedy, 618 P.2d at 796 (emphasis added).*

¶43.It is clear from the *Kennedy* decision that the Kansas Supreme Court extended Kansas's comparative negligence standard to product liability cases in order to "allocate responsibility for an injury" due to a defective product, disallowing defenses such as "assumption of the risk,""product misuse," or "unreasonable use" from completely

precluding recovery under Kansas product liability law. *See Kennedy*, 618 P.2d at 796. Kansas has no interest in allocating responsibility for the injuries suffered by Montana residents and caused by a product purchased in North Carolina. Again, the purpose of a state's product liability laws is to protect and provide compensation to its residents and regulate the sale of products within its borders. *See Thorton,* 999 F. Supp. at 1223-24.

¶44. Kansas law limits the total amount recoverable for "noneconomic loss" in a personal injury action to $250,000, and limits "nonpecuniary" damages in wrongful death actions to $100,000. Kan. Stat. Ann. §§ 60-19a02, 1903. Section 60-1903 was enacted in an effort to alleviate a perceived crisis in the availability and affordability of liability insurance. *See MacDonald v. General Motors Corp.* (6th Cir. 1997), 110 F.3d 337, 344 n.1 (citing Report on Kansas Legislative Interim Studies to the 1987 Legislature 568-69, 575 (Dec. 1986)). The purpose of these limitations would be furthered if any damage award issued would affect the availability or affordability of liability insurance for Kansas residents. The purpose of these limitations would not be furthered by applying them to the instant case because an award of damages against General Motors which exceeded Kansas's statutory damage limitations would not affect the availability or affordability of liability insurance for Kansas residents.

¶45. Lastly, Kansas law allows for punitive damages, but limits them to the lesser of $5 million or the defendant's highest gross annual income earned during any one of the five years immediately before the act for which such damages are awarded. *See* Kan. Stat. Ann. § 60-3701(e). The purpose of the availability and extent of punitive damage awards is to punish or deter conduct deemed wrongful when the availability of a cause of action and compensatory damages are considered an insufficient punishment or deterrence. *See, e. g., Tillett v. Lippert* (1996), 275 Mont. 1, 8, 909 P.2d 1158, 1162 ("The decisions of this Court further support the conclusion that punitive damages serve not only to punish, but also to set an example to the public for purposes of deterrence."). Accordingly, the purpose of Kansas's punitive damage provisions would only be furthered on a particular set of facts if it had an interest in punishing or deterring the conduct at issue. As noted above, the purpose of Kansas's cause of action for product liability would not be furthered by its application to these facts because the pickup was not sold in Kansas nor were the Byrds Kansas residents. Correspondingly, this case does not involve conduct which Kansas was attempting to punish or deter through its punitive damage provisions.

¶46. Place of Conduct.

¶47.The Byrds purchased the vehicle in North Carolina. General Motors has made a general assertion that North Carolina might have an interest in having its law applied, but has not briefed us on which North Carolina laws might be applicable. Accordingly, our discussion will be somewhat general in nature. General Motors has argued that North Carolina has an interest because General Motors initially sold the truck in North Carolina, the Byrds subsequently purchased the truck in North Carolina, and the Byrds may have been North Carolina residents when they made this purchase.

¶48.The fact that the Byrds purchased the truck in North Carolina while residing there indicates that one of the purposes of North Carolina product liability law-the regulation of products sold within its borders-might be implicated by the facts of this case. However, we think it significant that a North Carolina court would not apply North Carolina law to these facts, even if the Byrds had remained in North Carolina; North Carolina still adheres to the traditional place of injury rule in tort cases. *See, e.g., Gybe v. Gybe* (N.C. Ct. App. 1998), 503 S.E.2d 434. On the facts of this case, a North Carolina court would apply the law of Kansas because they still adhere to the "vested rights" theory that any right created by an injury is solely a product of the law of the territory in which that injury occurred. *See Terry v. Pullman Trailmobile, Inc.* (N.C. Ct. App. 1989), 376 S.E.2d 47, 49 ("If no right exists at the [place of injury], there is none to enforce anywhere."). Accordingly, the scope of North Carolina product liability law does not include causes of action for products purchased in North Carolina by North Carolina residents which cause injury outside of North Carolina. This belies the significance of North Carolina's interest in having its law applied. We note, however, that the place of purchase may have had greater significance if North Carolina followed the Restatement's approach rather than the traditional place of injury rule.

¶49.General Motors asserts that Michigan has an interest in regulating conduct occurring in Michigan. We note that evidence of where the pickup truck was designed and manufactured is not in the record nor has General Motors briefed us on the content of the precise laws which it claims might be applicable to these facts. However, we do not believe that the purpose of any potentially applicable Michigan product liability law would be to regulate the design and manufacture of products within its borders. *Cf. Crisman v. Cooper Indus.* (Tex. App. 1988), 748 S.W.2d 273, 277 ("[T]he mere design or manufacture of a defective product is not actionable. To invoke the doctrine of strict liability in tort, the product producing the injury must enter the stream of commerce."). The purpose of product liability law is to regulate in-state sales or sales to residents and to set the level of compensation when residents are injured. *See Thorton*, 999 F. Supp. at

1223-24

¶50.Significantly, Michigan courts have recognized that it would not further the purpose of Michigan product liability law to apply it to a similar set of facts. Michigan courts have not applied Michigan law under similar circumstances because Michigan has little interest in applying its law when its only contact with the dispute is the location of the manufacturer. *See, e.g., Farrell v. Ford Motor Co.* (Mich. App. 1993), 501 N.W.2d 567, *appeal denied*, 519 N.W.2d 158 (Mich. 1994) (holding that Michigan had little or no interest in applying its law to an out-of-state accident involving an out-of-state plaintiff and a Michigan manufacturer).

¶51.Other courts have observed that applying the law of the place of manufacture would be unfair because it would tend to leave victims under compensated as states wishing to attract and hold manufacturing companies would raise the threshold of liability and reduce compensation. *See Ness v. Ford Motor Co.* (N.D. Ill. 1993), No. 89-c-689, 1993 U.S. Dist. LEXIS 9938, *5. We agree that stressing the importance of the place of manufacture for choice of law purposes in a product liability case would be unfair. The conclusion that the place of manufacture is a relatively unimportant factor in a product liability case is obvious when we consider a hypothetical case in which all of the relevant contacts are in the forum state except the location of the manufacturer (most likely the fact pattern for the vast majority of product liability cases). Applying the law of the place of manufacture to that case simply because the product was manufactured out-of-state would allow a state with a high concentration of industry to capture all of the benefits of a high threshold of liability and a low level of compensation. Specifically, the manufacturing state could enjoy the benefits associated with liability laws which favored manufacturers in order to attract and retain manufacturing firms and encourage business within its borders while placing the costs of its legislative decision, in the form of less tort compensation, on the shoulders of nonresidents injured by its manufacturers' products. This seems inherently unfair.

¶52.Residence of Parties.

¶53.The Plaintiffs were residents of Montana at the time they were injured. Unlike the laws of the other states with relevant contacts under § 145(2), the purposes sought to be achieved by Montana's product liability laws would be furthered by their application to this set of facts.[1] One of the central purposes of Montana's product liability scheme is to prevent injuries to Montana residents caused by defectively designed products. In contrast

to Kansas, Montana has a direct interest in the application of its product liability laws because its residents were injured in this accident. Montana adopted a strict liability standard in order to afford "*maximum protection for consumers against dangerous defects in manufactured products with the focus on the condition of the product, and not on the manufacturer's conduct or knowledge.*" *See Sternhagen v. Dow Co.* (1997), 282 Mont. 168, 176, 935 P.2d 1139, 1144 (emphasis added).

¶54. As is clear from *Sternhagen*, the focus of Montana law is not only on the regulation of products sold in Montana, but also on providing the maximum protection and compensation to Montana residents with the focus on the condition of the product and not on the conduct of the manufacturer. Applying Montana's provisions guaranteeing strict liability and full compensation to a cause of action involving a Montana domiciliary injured by a defective product would further the purposes of Montana law by insuring that the costs to Montana residents due to injuries from defective products are fully borne by the responsible parties. It will also have the salutary effect of deterring future sales of defective products in Montana and encouraging manufacturers to warn Montana residents about defects in their products as quickly and as thoroughly as possible.

¶55. Likewise, the purposes of Montana's laws regarding the availability and extent of punitive damages in product liability actions would also be furthered by their application to these facts. This is because, as described more fully above, punitive damages serve to punish and deter conduct deemed wrongful-in this case, placing a defective product into the stream of commerce which subsequently injured a Montana resident. *See Tillett*, 275 Mont. at 8, 909 P.2d at 1162 (the purpose of punitive damages is to punish and deter culpable conduct).

¶56. Lastly, we must address whether the purpose underlying Montana's rules governing product liability would be furthered by their application in this case despite the fact that Samuel Byrd is no longer a Montana domiciliary. We believe that the application of Montana law to an injury received by a Montana domiciliary would further the purpose of that law regardless of the postaccident residency of the plaintiff. As discussed previously, the purpose of Montana product liability law is to regulate product sales in Montana and to compensate injured Montanans. Clearly, that concern arises as soon as a product is either sold in Montana or causes injury to a Montana resident. Consequently, the relevant residence of the plaintiff is the residence at the time of injury.

¶57. We note that the only reason Samuel Byrd is currently residing in North Carolina is

because his parents died in the accident which forms the basis of the Plaintiffs' claims. The guarantee of full compensation for Montana residents who suffer injuries due to defective products certainly will not turn on such fortuitous circumstances as a postaccident move caused by the allegedly wrongful conduct of a defendant.

¶58. The place where the relationship, if any, between the parties is centered.

¶59. It doesn't appear that there is a place where the relationship, if any, between General Motors and the Byrds is centered. As one court described in similar circumstances:

[P]roducts liability arises out of the most casual "relationship" imaginable, the one-time purchase and sale of the product, and the plaintiff, as here, may have had no connection with it. The only "relationship" between the parties here is that of injured victim and alleged tortfeasor.

*Ness, 1993 U.S. Dist. LEXIS 9938, *9.*

¶60. In sum, upon an analysis of the principle requiring us to consider the policies of interested states, it appears that Montana, as the domicile of the Byrds, has a significant relationship to the issues raised by this dispute. This is because, in general, the purpose of a state's product liability law is to regulate purchases made within its borders and to protect and compensate its residents. The policies underlying Montana product liability law would be furthered on these facts because the Byrds were Montana domiciliaries at the time they were injured. The policies underlying Kansas and Michigan law would not be furthered by their application to these facts because the product was not sold in either state, nor were the Plaintiffs domiciled in either state at the time they where injured. The purposes underlying North Carolina product liability law would not be furthered on these facts because, under North Carolina's vested rights approach to conflict of laws, North Carolina would apply the law of the jurisdiction where the injury occurred, whatever that law may be.

¶61.. Justified Expectations.

¶62. Although we are to consider the justified expectations of the parties, tort cases generally do not involve justified expectations. Particularly in the area of negligence, when parties act without giving thought to the legal consequences of their conduct or to the law to be applied, they have no justified expectations. *See* Restatement (Second) § 6

cmt. g.

¶63.Automobile manufacturers do presumably give advance thought to the legal consequences of their conduct when designing and manufacturing their products. However, we note that the law of any state could potentially apply in a product liability action involving an automobile. For example, because North Carolina employs the traditional place of injury rule for choice of law purposes, if a North Carolina resident receives an injury from a defective vehicle while driving out-of-state, the law of the place of injury would govern that dispute. *See Gybe*, 503 S.E.2d 434-35. Accordingly, any expectation General Motors had that the law of North Carolina would govern a product liability suit involving a pickup truck it sold in North Carolina would not be justified. Furthermore, as noted by the court in *Ness,* automobiles are moveable and frequently resold and the maintenance of a product liability action does not require privity. *See Ness*, 1993 U.S. Dist. LEXIS 9938, *6. For example, the pickup could have been subsequently resold by the initial purchaser in a state which does not adhere to the traditional *lex loci* rule. Therefore, any expectation General Motors had that a dispute concerning this pickup truck would be governed by North Carolina's place of injury rule would not be justified.

¶64. Basic Policies Underlying Particular Field of Law.

¶65.We must also consider the relevant contacts in regard to the basic policies underlying the particular field of law. *See* Restatement (Second) § 6(2)(e). The drafters state that:

This factor is of particular importance in situations where the policies of the interested states are largely the same but there are nevertheless minor differences between their relevant local law rules. In such instances, there is good reason for the court to apply the local law of the state which will best achieve the basic policy, or policies, underlying the particular field of law involved.

Restatement (Second) § 6(2) cmt. h.

¶66.This is not a case in which the policies of interested states are basically the same except for minor differences in their local rules. For example, although under Kansas and Montana law, manufacturers of defective products are strictly liable for injuries, North Carolina law does not permit strict liability in tort in product liability actions. *Compare Wood v. Old Trapper Taxi* (1997), 286 Mont. 18, 24-25, 952 P.2d 1375, 1379 (observing that Montana has adopted strict liability in tort for product liability), *with* N.C. Gen. Stat. §

99B-1.1 (disallowing strict liability in product liability actions). Instead, it appears that the various interested states have reached different conclusions concerning the right level of compensation and deterrence for injuries caused by defective products. Therefore, we need go no further in addressing this contact.

¶67.. Certainty, Predictability, Uniformity, Ease.

¶68.We are also instructed to give consideration to the certainty, predictability and uniformity of result as well as the ease in the determination and application of the law to be applied. *See* Restatement (Second) § 6(2)(f) and (g). The comments state:

Predictability and uniformity of result are of particular importance in areas where parties are likely to give advance thought to the legal consequences of their transactions. It is partly on account of these factors that the parties are permitted within broad limits to choose the law that will determine the validity and effect of their contract . . . .

Restatement (Second) § 6(2) cmt. i.

¶69.A consideration of this principle does not indicate that any one state has a more significant relationship than any other. Applying the law of the place of injury would not increase certainty or predictability any more than applying the law of the plaintiff's residence at the time of accident.

¶70.C. Conclusion.

¶71.Under the most significant relationship approach of the Restatement (Second), the local law of the place of injury, Kansas, governs the rights and liabilities of the parties to a product liability and wrongful death action unless, with respect to a particular issue, a different state has a more significant relationship. *See* Restatement (Second) §§ 146 and 175. In order to determine whether a state other than the place of injury has a more significant relationship, the contacts listed under § 145(2) must be analyzed in relation to the principles enumerated under § 6(2). However, the principles of § 6(2) need not be given equal consideration in each case. Varying weight must be given to a particular factor, or group of factors, in different areas of choice of law. *See* Restatement (Second) § 6 cmt. c. On the facts before us, we give most weight to the principles requiring us to consider the relevant policies of interested states. Restatement (Second) § 6(2)(b) and (c). The other principles do not indicate the significance of any one contact.

¶72.Upon an analysis of the policies of interested states, it appears that the purposes of both Montana and North Carolina product liability law would presumably be furthered by their application to these facts. The place of purchase has an interest in regulating the safety of products sold within its borders; the place of the plaintiff's residence has an interest in deterring injuries to its residents and setting the level of compensation. Significantly, however, North Carolina law would not apply its own law to these facts, even if the Byrds had been North Carolina residents at the time of injury.

¶73.The purpose behind Montana product liability laws is clearly implicated by these facts. The following factors all point toward applying Montana law: the Byrds resided in Montana at the time of the accident, General Motors does business in Montana, Montana has a direct interest in preventing defective products from causing injuries to Montana residents as well as punishing and deterring manufacturers whose products injure Montana residents, and finally Montana is interested in fully compensating Montana residents. All of these factors would be furthered by applying Montana product liability, defenses, damages, and wrongful death statutes to the facts of this case.

## ISSUE THREE

¶74.Does Montana recognize a "public policy" exception that would require application of Montana law even where Montana's choice of law rules dictate application of the laws of another state, and would such an exception apply in this case?

¶75.For choice of law purposes, the public policy of a state is simply the rules, as expressed in its legislative enactments and judicial decisions, that it uses to decide controversies. *See Casarotto*, 268 Mont. at 375, 886 P.2d at 935; *see also Rothwell v. Allstate Ins. Co.*, 1999 MT 50, ¶24, 293 Mont. 393, ¶ 24, 976 P.2d 512, ¶ 24 (Gray, J., dissenting) ("It can-and should-be said that every statute duly enacted by the Legislature is an expression of public policy with regard to its subject matter."). The purpose of a choice of law rule is to resolve conflicts between competing policies. Considerations of public policy are expressly subsumed within the most significant relationship approach. *See* Restatement (Second) § 6(2)(b) and (c) (mandating consideration of the relevant policies of the forum state and other interested states). In order to determine which state has the more significant relationship, the public policies of all interested states must be considered. A "public policy" exception to the most significant relationship test would be redundant.

¶76. Accordingly, in answer to the questions certified, we adopt the Restatement (Second) of Conflict of Laws for tort actions. Under the analysis contained in the Restatement (Second), we conclude that given the facts as presented in the District Court's Order, the laws of Montana apply. Lastly, considerations of public policy are accounted for under the analysis contained in the Restatement (Second) of Conflict of Laws.

/S/ JIM REGNIER

We Concur:

/S/ J. A. TURNAGE

/S/ WILLIAM E. HUNT, SR.

/S/ KARLA M. GRAY

/S/ W. WILLIAM LEAPHART

/S/ JAMES C. NELSON

/S/ TERRY N. TRIEWEILER

1. In analyzing the place of manufacture, we fully addressed the relative significance of General Motors' principal place of business under this principle. Neither party asserts that Delaware, General Motors' place of incorporation, has any interest in having its product liability or wrongful death statutes apply to this case.