FILED

10/04/2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0690

DA 15-0690

IN THE SUPREME COURT OF THE STATE OF MONTANA

2016 MT 247

JASON T. TALBOT,

Plaintiff and Appellee,

v.

WMK-DAVIS, LLC,

Defendant,

and

CUDD PRESSURE CONTROL, INC.,

Intervenor and Appellant.

APPEAL FROM:     District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DV 14-1234
Honorable Gregory R. Todd, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Emily Jones (argued), Carey E. Matovich, Matovich, Keller & Murphy,
P.C., Billings, Montana

For Appellee:

Alexander (Zander) Blewett, III, Alexander (Anders) Blewett, IV
(argued), Hoyt & Blewett PLLC, Great Falls, Montana

Bradley E. Norman, Norman & Edmen PLLC, Oklahoma City, Oklahoma

Argued and Submitted: May 25, 2016
Decided: October 4, 2016

Filed:

_____
Clerk

Justice Patricia Cotter delivered the Opinion of the Court.

¶1 Appellant Cudd Pressure Control, Inc. (Cudd) seeks to assert a subrogation lien to recover workers' compensation benefits paid to Jason T. Talbot. Following cross-motions for partial summary judgment on the issue of whether Cudd could assert a workers' compensation subrogation lien, the District Court determined that such claims were prohibited in Montana until the Plaintiff had been made whole and granted Plaintiff's Motion for Partial Summary Judgment. Cudd appeals. We affirm.

## ISSUES

¶2 On appeal, Cudd raises three issues, which we restate as follows:

*1. Did the District Court err in determining that, under* Oberson v. Federated Mutual Insurance Co.*, Montana courts will not conduct a choice of law analysis when determining the validity of a workers' compensation subrogation lien?*

*2. Did the District Court err in granting summary judgment in favor of Talbot?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 On March 18, 2014, Jason Talbot, a resident of Oklahoma, was seriously injured while crossing an intersection in Billings, Montana, when he was struck by a vehicle driven by Johnathan Tokarski, an employee of WMK-Davis, LLC (WMK-Davis). At the time of the accident, Talbot was employed by, and had travelled to Montana on business for, Cudd Pressure Control, Inc. Subsequently, Talbot filed a workers' compensation claim in Oklahoma. That claim is ongoing.

¶4 In August of 2014, Talbot filed a Complaint and Demand for Jury Trial in the Thirteenth Judicial District Court, Yellowstone County, against Tokarski. Talbot then amended his complaint to include WMK-Davis. In April of 2015, Cudd filed a motion to

2

intervene in order to assert a workers' compensation subrogation lien against Talbot's potential tort recovery. Such an action is allowable under Oklahoma law, where there is a statutory policy in favor of subrogation. *See* Okla. Stat. tit. 85A, § 43 (2016); *Caffey v. Soloray*, 57 P.3d 870, 874 (Okla. 2002).

¶5 Following Cudd's successful intervention, the parties filed cross-motions for summary judgment to determine whether Cudd would be allowed to assert a workers' compensation subrogation lien in the underlying action, as Oklahoma law directly conflicts with Montana's rule that a party may not subrogate until the injured worker has been made whole. The District Court granted Talbot's motion for summary judgment and held that Montana law applied and Cudd was prohibited from asserting such a lien. Cudd appeals.

## STANDARD OF REVIEW

¶6 We review a district court's summary judgment ruling de novo, applying the same rule, M. R. Civ. P. 56(c)(3), that a district court does when ruling on a summary judgment motion. Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." M. R. Civ. P. 56(c)(3); *Victory Ins. Co. v. Mont. State Fund*, 2015 MT 82, ¶ 10, 378 Mont. 388, 344 P.3d 977 (internal citations omitted). "We will affirm the district court when it reaches the right result, even if it reaches the right result for the wrong reason." *State v. Marcial*, 2013 MT 242, ¶ 10, 371 Mont. 348, 308 P.3d 69 (quoting *State v. Ellison*, 2012 MT 50, ¶ 8, 364 Mont. 276, 272 P.3d 646).

3

## DISCUSSION

¶7 Talbot was struck by a truck at an intersection in Billings, Montana, at the age of 39. As a result of the collision, Talbot, a father of three, suffered an extensive brain injury as well as multiple orthopedic injuries. Talbot's medical bills exceed $680,000 and are still accruing. Talbot's economist estimates that his loss of earning capacity has a value in excess of $3.4 million. Although the tortfeasor Tokarski carried high limits of liability insurance, the limits were inadequate to fully compensate Talbot. Cudd does not argue that, under Montana law, Talbot has been made whole by virtue of his recovery.

¶8 Talbot filed a workers' compensation claim in Oklahoma and is still being treated there for his injuries. On behalf of Talbot, Cudd paid approximately $600,000 in medical and disability payments. Upon intervening in Talbot's personal injury case in Yellowstone County, Cudd attempted to assert a workers' compensation subrogation lien against any recovery Talbot might make in the case. It did so pursuant to an Oklahoma statute that entitles an employer

> to a first lien on two-thirds (2/3) of the net proceeds recovered in the action that remain after the payment of the reasonable costs of collection, for the payment to them of the amount paid and to be paid by them as compensation to the injured employee or his or her dependents.

Okla. Stat. tit. 85A, § 43(A)(1)(c). Talbot argued in the District Court that the workers' compensation lien of Cudd was invalid under the Montana Constitution and Montana law.

¶9 On cross-motions for summary judgment, the District Court agreed with Talbot, holding that this Court's decision in *Oberson v. Federated Mutual Insurance Co.*, 2005

4

MT 329, 330 Mont. 1, 126 P.3d 459, prohibited Montana courts from undertaking a choice of law analysis under the Restatement (Second) Conflict of Laws (Restatement) when determining whether a workers' compensation subrogation lien could be asserted against an injured worker who had not been made whole. Further, the District Court distinguished *Oberson* from our decision in *Phillips v. General Motors Corp.*, 2000 MT 55, 298 Mont. 438, 995 P.2d 1002, noting that the two decisions advocated different approaches for determining which state's law applies in a particular case because *Phillips* dealt with a personal injury/product liability/wrongful death action while *Oberson* dealt specifically with workers' compensation subrogation. The District Court applied Montana's "made whole" doctrine and held that Cudd was precluded from attaching a workers' compensation subrogation lien to Talbot's potential tort recovery prior to Talbot being made whole.

¶10 The preliminary question before us is whether a Montana court should undertake a choice of law analysis before determining whether a workers' compensation subrogation lien may be asserted against an injured worker prior to the party being made whole. More specifically, this case allows us to further clarify our approach to choice of law issues in workers' compensation subrogation cases following our decisions in *Phillips v. General Motors Corp.*, and *Oberson v. Federated Mutual Insurance Co*. We begin by summarizing our holdings in *Phillips* and *Oberson*.

¶11 In *Phillips*, we answered three questions certified to this Court by the United States District Court for the District of Montana; the first and third questions are particularly relevant here. Question One asked "[w]hether, in a personal injury/product

5

liability/wrongful death action, where there is a potential conflict of laws, Montana will follow the Restatement (Second) of Conflict of Laws, including the 'most significant relationship' test set forth in §§ 146 and 6, in the determination of which state's substantive law to apply?" *Phillips*, ¶ 2. In answering, we considered the merits of the traditional choice of law rule, lex loci delicti commissi, which provides "the infliction of injury is actionable under the law of the state in which it was received." *Phillips*, ¶ 16. In our analysis, we placed particular emphasis on moving away from rigid rules for resolving choice of law questions. We noted that the Restatement provides "a more flexible approach which permits analysis of the policies and interests underlying the particular issue before the court," and determined that "any analysis under the Restatement approach is necessarily driven by the unique facts, issues, applicable law, and jurisdictions implicated in a particular case." *Phillips*, ¶¶ 22, 26 (quoting *In re Air Crash Disaster at Boston, Mass. on July 31, 1973*, 399 F. Supp. 1106, 1110 (D. Mass. 1975)). Further, we stated that "[w]e see no reason to have one choice of law approach for contracts and another for torts," noting that we had previously adopted the Restatement (Second) approach for conflict of law issues sounding in contract. *Phillips*, ¶ 23 (citing *Casarotto v. Lombardi*, 268 Mont. 369, 886 P.2d 931 (1994), *vacated and remanded on other grounds sub nom Doctor's Associates, Inc. v. Casarotto*, 515 U.S. 1129, 115 S. Ct. 2552 (1995), *reaff'd on reh'g Casarotto v. Lombardi*, 274 Mont. 3, 901 P.2d 596 (1995), *reversed and remanded on other grounds sub nom Doctor's Associates Inc. v. Casarotto*, 517 U.S. 681, 116 S. Ct. 1652 (1996)). Subsequently, we answered yes to the first certified question and adopted the Restatement (Second)'s "most significant

relationship" test for choice of law questions involving issues sounding in tort. *Phillips*, ¶ 23.

¶12 Question Three asked whether Montana recognized "a 'public policy' exception that would require application of Montana law even where Montana's choice of law rules [might otherwise] dictate application of the laws of another state, and would such an exception apply in this case?" *Phillips*, ¶ 74. We noted that "[f]or choice of law purposes, the public policy of a state is simply the rules, as expressed in its legislative enactments and judicial decisions, that it uses to decide controversies." *Phillips*, ¶ 75 (citations omitted). We then determined that Montana did not recognize a public policy exception to the most significant relationship test, stating that "[t]he purpose of a choice of law rule is to resolve conflicts between competing policies," and that "[c]onsiderations of public policy are expressly subsumed within the most significant relationship approach." *Phillips*, ¶ 75.

¶13 Five years later, this Court decided *Oberson*. In *Oberson*, Musselman, a Michigan resident, suffered "catastrophic" injures while working in Montana for a Michigan-based employer. *Oberson*, ¶¶ 4-5. Subsequently, he filed a workers' compensation claim in Michigan and a personal injury claim in Montana. *Oberson*, ¶ 4. Federated Mutual Insurance Company (Federated) sought to subrogate against Musselman's Montana personal injury award for benefits paid pursuant to Musselman's workers' compensation claim, and filed a subrogation claim in Michigan's workers' compensation court. *Oberson*, ¶¶ 1, 6. Musselman filed a declaratory action in Montana seeking a determination that Montana law governed "the enforceability of Federated's subrogation

7

interest," and that Montana law precluded Federated from subrogating until Musselman had been made whole. *Oberson*, ¶ 6.

¶14    The dispositive question for this Court was "whether Montana law governs a subrogation claim brought by a workers' compensation insurer for reimbursement of benefits paid to a Michigan worker who, injured while working in Montana, recovered a third-party personal injury judgment in a Montana court." *Oberson*, ¶ 3.  On appeal, Federated presented three arguments.

¶15    First, Federated argued comity demanded that this Court defer to Michigan's workers' compensation court for a determination of Federated's subrogation interests. *Oberson*, ¶ 10.  We stated that comity was not a rule of law "but rather 'an expression of one state's entirely voluntary decision to defer to the policy of another.'" *Oberson*, ¶ 10 (quoting *Simmons v. State*, 206 Mont. 264, 289, 670 P.2d 1372, 1385 (1983)).  Citing Michigan's lack of a strong public policy in favor of retaining jurisdiction, we noted that the strength of Montana's public policy against subrogation prior to full recovery by injured parties, as articulated in Article II, Section 16, of Montana's Constitution, weighed against relinquishing jurisdiction and therefore rejected Federated's argument. *Oberson*, ¶ 10.

¶16    Second, Federated argued that if Montana courts had jurisdiction, the Montana Workers' Compensation Court was the proper forum for resolution. *Oberson*, ¶ 11.  We rejected this argument, noting that the "monetary recovery implicated here flows exclusively from tort damages suffered in Montana, adjudicated in federal civil court, and directed by Montana's substantive tort law." *Oberson*, ¶ 11.

8

¶17 Finally, Federated argued that, if the Workers' Compensation Court was not the proper forum, this Court should adopt § 185 of the Restatement to determine choice of law issues involving workers' compensation subrogation. *Oberson*, ¶ 12. Section 185 requires that the local law of the state in which the workers' compensation benefits were paid be applied to determine the subrogation rights of the benefit paying parties. *Oberson*, ¶ 12. In evaluating § 185, we underscored the importance of determining the applicability of the Restatement "in light of Montana's public policies and the Legislature's statutory guidance." *Oberson*, ¶ 13. Further, we noted our consistent rejection of rigid rules in favor of a "more flexible approach which permits analysis of the policies and interests underlying the particular issue before the court." *Oberson*, ¶ 13 (quoting *Phillips*, ¶ 22). Because § 185 contained a rigid rule for choice of law questions involving workers' compensation subrogation, we determined that the section did not accord with our preference for a more flexible approach and was inapplicable in Montana. *Oberson*, ¶ 13. We therefore declined to adopt and apply § 185, and concluded that Montana law precluded subrogation by Federated pursuant to Montana's "made whole" doctrine. *Oberson*, ¶ 17.

¶18 The Dissent argues that our decision to reject § 185 was grounded in "basic subrogation principles premised upon a subrogation lien being derivative in nature." Dissent, ¶ 47. We disagree. As noted, this Court's eventual conclusion in *Oberson* rested firmly on Montana's strong public policy against subrogation: "Montana's public policy, as defined in Article II, Section 16, precludes application of Michigan subrogation law to

9

Musselman's personal injury recovery until Musselman realizes the full measure of his adjudicated damages." *Oberson*, ¶ 17.

¶19 We also disagree with the Dissent's argument that "the analytical basis for our decision in *Oberson* was the premise that the subrogation claim flowed from damages obtained following the application of Montana law to the underlying tort action." Dissent, ¶ 47. In *Oberson*, we stated that our decisions in *Trankel v. Dept. of Military Affairs*, 282 Mont. 348, 938 P.2d 614 (1997), *Youngblood v. American States Ins. Co.*, 262 Mont. 391, 866 P.2d 203 (1993), and *Swanson v. Hartford Ins. Co. of Midwest*, 2002 MT 81, 309 Mont. 269, 46 P.3d 584, were "determinative in our choice of law analysis." *Oberson*, ¶ 17. In each of those cases, we relied on Article II, Section 16, Montana Constitution, and the "made whole" doctrine as the basis for precluding subrogation prior to an injured party being made whole. In summary, the analytical basis for our decision in *Oberson* was the presence of a constitutional provision which absolutely prohibited the enforcement of "'[a]ny statute or court decision which deprives an employee of his right to full legal redress.'" *Oberson*, ¶ 15 (quoting *Trankel*, 282 Mont. at 362, 938 P.2d at 623).

¶20 *1. Did the District Court err in determining that, under* Oberson v. Federated Mutual Insurance Co.*, Montana courts will not conduct a choice of law analysis when determining the validity of a workers' compensation subrogation lien?*

¶21 Cudd argues that the District Court erred in determining that *Oberson* prevented Montana courts from undertaking a choice of law analysis in cases involving workers' compensation subrogation liens where the damaged party has not been made whole. Further, Cudd argues that we should apply the principles of § 6 and the "most significant

10

relationship" test articulated in § 145[1] of the Restatement (Second) Conflict of Laws, as adopted in *Phillips*, and revisit our refusal in *Oberson* to adopt § 185 of the Restatement.

¶22    Section 145 of the Restatement, contained within Chapter 7, Topic 1, entitled "Torts," provides:

> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
> (a) the place where the injury occurred,
> (b) the place where the conduct causing injury occurred,
> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
> (d) the place where the relationship, if any, between the parties is centered.
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

In summary, § 145 is used to supplement the principles of § 6 of the Restatement to account for the considerations unique to issues involving tortious conduct.

¶23    Under the Restatement a choice of law analysis is two-part. As we noted in *Phillips*, "[a]ny conflict of law analysis under the Restatement must begin with § 6." *Phillips*, ¶ 28. Section 6 first asks whether the forum state has a statutory directive concerning choice of law applicable to the underlying cause of action. Restatement (Second) Conflict of Laws § 6(1). If a statutory directive is present, the inquiry is ended and the court applies the statute. However, in the absence of such a directive, the Court

---

[1]  In *Phillips*, we recognized that even though the specific Restatement sections implicated in a personal injury/products liability/wrongful death case are §§ 146 and 175, the "most significant relationship test is contained in § 145(2). *Phillips*, ¶ 30 ("Whether another state has a more significant relationship is determined under § 145(2).")

11

considers both the principles outlined in § 6(2) and the specific section of the Restatement that is applicable to the case. *Phillips*, ¶¶ 28-30. Section 6(2) provides:

> (2) Where there is no such directive, the factors relevant to the choice of the applicable rule of law include:
> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of a particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability, and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

We have previously noted that this section provides "a more flexible approach which permits analysis of the policies and interests underlying the particular issue before the court," and stated that "[a]ny analysis under the Restatement approach is necessarily driven by the unique facts, issues, applicable law, and jurisdictions implicated in a particular case." *Phillips*, ¶¶ 22, 26 (quoting *In re Air Crash Disaster at Boston, Mass. on July 31, 1973*, 399 F. Supp. at 1110).

¶24 In *Phillips*, the underlying case involved a "personal injury/product liability/wrongful death action." *Phillips*, ¶ 2. Because Montana did not have an applicable statutory directive regarding choice of law, this Court looked to both the principles outlined in § 6 and the specific sections of the Restatement that relate to tort and personal injury actions, §§ 146 and 175, to determine the appropriate choice of law analysis. *Phillips*, ¶¶ 27-30. Sections 146 and 175 require that the rights of the parties be determined in accordance with the laws of the state where the injury occurs unless another state has a more significant relationship. *Phillips*, ¶ 30; *see also* Restatement

12

(Second) Conflict of Laws §§ 145(2)(a)-(d) (containing the guidelines for determining whether another state has a more significant relationship). Therefore, we adopted the Restatement's "most significant relationship" test in order to determine which state's substantive law would apply to issues sounding in tort. *Phillips*, ¶ 23.

¶25 It is this "most significant relationship" test that Cudd and the Dissent urge this Court to adopt in the instant case. In the interest of clarity, we reiterate that the "most significant relationship" test is not a subset of § 6(2) of the Restatement, as the Dissent appears to argue, but is found within § 145. This Court turned to § 145 in *Phillips* because § 146 specifically directs a court to that section when undertaking a choice of law analysis involving issues sounding in tort. We have not been presented with a convincing argument as to why, in cases where there is not a statutory directive on point, we should abandon our long standing method of applying the general § 6(2) factors along with the specific Restatement factors implicated by the choice of law issue, here § 185, in favor of the Dissent's proposed new rule that, in the context of workers' compensation subrogation liens, we should apply the choice of law analysis we use for issues sounding in tort.

¶26 Further, we are confused by the Dissent's argument that we have created a public policy exception to the "most significant relationship" test. Dissent, ¶ 49. We are explicitly refusing to apply the "most significant relationship" test in this case, as the Restatement provides a section, § 185, that applies directly to issues involving workers' compensation subrogation. Section 185 states

13

[t]he local law of the state under whose workmen's compensation statute an employee has received an award for an injury determines what interest the person who paid the award has in any recovery for tort or wrongful death that the employee may obtain against a third person on account of the same injury.

As we noted in *Oberson*, this section creates a rigid rule for determining choice of law issues involving workers' compensation subrogation liens.

¶27 After hearing oral argument in the instant case, and further considering the issue, we conclude that Montana courts should utilize the Restatement to determine choice of law issues involving the application of workers' compensation subrogation liens to tort recoveries in Montana. This will bring us in line with the analyses we utilize in contract and tort cases. We nonetheless conclude that *Oberson* was correctly decided, and therefore reaffirm that the rigid test set forth in § 185 is not applicable in Montana.

¶28 We reiterate here the distinction between actions in tort, such as *Phillips*, and subrogation actions, as present in the instant case. *Phillips* expressly denied the existence of a public policy exception to the "most significant relationship" test. *Phillips*, ¶ 75. We noted that "[c]onsiderations of public policy are expressly subsumed within the most significant relationship approach," making a public policy exception "redundant." *Phillips*, ¶ 75. In contrast, § 185 is silent as to the concerns of public policy. Therefore, while an exception was not warranted in *Phillips* because the applicable test adequately addressed public policy, the Restatement's lack of consideration of public policy when evaluating workers' compensation subrogation claims requires us to consider whether the public policy exception contained in § 90 of the Restatement should be applied.

14

¶29     Section 90, entitled "Action Contrary to Public Policy," is found within Restatement Chapter 4, Limitations on the Exercise of Judicial Jurisdiction, Topic 2, Limitations Imposed by the Forum.  It provides:  "No action will be entertained on a foreign cause of action the enforcement of which is contrary to the strong public policy of the forum."  Restatement (Second) Conflict of Laws § 90.  It is meant to be narrow in scope, rarely applied, and relevant only "where the forum refuses to entertain the suit on the ground that the cause of action is contrary to a strong local public policy."  Restatement (Second) Conflict of Laws § 90 cmt. a, c.  Thus, § 90 acts as a potential limit on the application of other Restatement sections.

¶30     As this Court has yet to address § 90 in this context, we find the Supreme Court of Ohio's reasoning in *American Interstate Insurance Co. v. G & H Service Center, Inc.*, 861 N.E.2d 524 (Ohio 2007) [hereinafter *American Interstate*], instructive.  In *American Interstate*, the Court addressed an almost identical factual situation to that in the instant case.  There, an employee, residing in Louisiana, was injured in Ohio in the course of his employment.  He filed a workers' compensation claim in Louisiana.  Subsequently, he filed a personal injury claim in Ohio.  Insurer American Interstate filed a complaint in Ohio to assert its right of subrogation, pursuant to Louisiana law.  *American Interstate*, 861 N.E.2d at 526.  The employee challenged the subrogation rights and filed a personal injury cross-claim.  *American Interstate*, 861 N.E.2d at 526.  The Court stated that, because the employee had filed his workers' compensation claim in Louisiana, § 185 required that Louisiana law govern the determination of whether or not a workers' compensation subrogation claim could be brought against the employee's tort recovery.

15

*American Interstate*, 861 N.E.2d at 527. Before making a final determination, however, the Court noted that § 90 potentially limited the applicability of §185, stating "in this case, even though the Restatement is clear that it is Louisiana law that should apply to the subrogation claim, it is still necessary to determine whether allowing American Interstate to assert its subrogation rights under Louisiana law would violate Ohio's public policy." *American Interstate*, 861 N.E.2d at 528.

¶31    The Ohio Court pointed out that courts have applied a similar public policy exception to determine whether application of foreign law, as opposed to entertainment of a foreign cause of action, would run counter to the interests of the state's citizens. *American Interstate*, 861 N.E.2d at 528. In such cases, the courts require "that a state's interest in, and relation to, an issue be significant enough that application of foreign law would threaten that policy." *American Interstate*, 861 N.E.2d at 528. As one noted treatise has observed, "[t]he Restatement, Second draws a fine distinction between a refusal to entertain an action and the application, for public policy reasons, of forum law." Eugene F. Scoles, Peter Hay, Conflict of Laws, § 3.15 at 74 (1982). We agree with the Ohio court's conclusion that, "[b]ecause the public-policy concerns are essentially the same whether the question is one of applying foreign law or bringing a foreign action, these considerations are equally relevant when considering Section 90's public-policy exception." *American Interstate*, 861 N.E.2d at 528.

¶32    The Court's ultimate decision on whether Ohio's public policy prevented subrogation was grounded in an analysis of previous Ohio case law, Ohio's statutory scheme governing workers' compensation subrogation, and the Ohio Constitution.

16

*American Interstate*, 861 N.E.2d at 529. The Court determined that, as a matter of public policy, Ohio did not disfavor subrogation claims. *American Interstate*, 861 N.E.2d at 529. In reaching this determination, the Court noted that not only had its previous decisions refrained from declaring that the idea of subrogation was generally unconstitutional or against public policy, the Ohio General Assembly had recently amended the State's subrogation statute to retain the right of subrogation in favor of the workers' compensation insurer. *American Interstate*, 861 N.E.2d at 529. Nonetheless, both Ohio's § 90 analysis and its manner of resolving its application are instructive here.

¶33 As did the Ohio Supreme Court, we examine whether allowing Cudd to assert its subrogation rights in Montana pursuant to Oklahoma law would violate Montana's public policy. In making this determination, we consider our case law and our state Constitution. The Montana Constitution provides a clear statement of public policy regarding workers' compensation subrogation liens. Article II, Section 16, provides in relevant part, "No person shall be deprived of this full legal redress for injury incurred in employment for which another person may be liable except as to fellow employees and his immediate employer who hired him if such immediate employer provides coverage under the Workmen's Compensation Laws of this state." Mont. Const. art. II, § 16. "This Court has consistently interpreted the language of Article II, Section 16 as precluding the subrogation of a tort award until the damaged party fully recovers." *Oberson*, ¶ 14.

¶34 In *Francetich v. State Compensation Mutual Insurance Fund*, 252 Mont. 215, 827 P.2d 1279 (1992), we stated that this provision "is mandatory, prohibitive, and

17

self-executing and it prohibits depriving an employee of his full legal redress, recoverable under general tort law, against third parties." *Francetich*, 252 Mont. at 224, 827 P.2d at 1285. Further, we have held that there is "no room for erosion based on what federal courts or the courts of other states would do pursuant to federal laws or the laws of other states." *Trankel*, 282 Mont. at 362, 938 P.2d at 623. Thus, we have consistently interpreted this constitutional provision as precluding workers' compensation subrogation of an injured employee's tort recovery prior to the employee being made whole. *Francetich*, 252 Mont. at 224, 827 P.2d at 1285; *Oberson*, ¶¶ 14, 17.

¶35 By including Article II, Section 16, in our Constitution, Montana has immortalized a strong public policy interest in preventing subrogation of tort awards prior to an injured worker being made whole. The provision's inclusion within Article II, the Declaration of Rights, illustrates how truly important the citizens of this state hold this principle to be. Therefore, we conclude that the constitutional provision forbidding subrogation prior to an injured worker being made whole is evidence of an exceptionally strong public policy interest as contemplated by § 90 of the Restatement.

¶36 We are cognizant of the very limited scope of § 90 and the requirement that courts should not refuse to entertain causes of action unless to do so "would violate some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal." *Loucks v. Standard Oil Co. of New York*, 120 N.E. 198, 202 (N.Y. 1918).

¶37 The language of Article II, Section 16, and our recurrent opinions underscoring its importance implicate the "fundamental principles of justice" contemplated by § 90.

18

Montana has an exceptionally strong public policy precluding the application of a workers' compensation subrogation lien to an injured worker's tort recovery prior to that party being made whole. Further, comparing Oklahoma and Montana law on this subject reveals not a mere difference, but a deep-seated disparity between the values embodied in Montana's Constitution and those codified in the Oklahoma statute. In 2014, the Oklahoma legislature modified the statutory scheme governing workers' compensation subrogation. The new scheme allows an employer to recover 2/3rds of the injured worker's tort recovery, or the full amount of the lien, whichever is less, for repayment of the amount paid under the Workers' Compensation Act. Okla. Stat. tit. 85A, § 43. As noted by the Oklahoma Court of Civil Appeals, under Oklahoma law, "a statutory subrogation right is not limited by the 'make whole' rule." *Tomlinson v. Cont'l Cas. Co.*, 77 P.3d 628, 632 (Okla. Civ. App. 2003). The contrast between the Oklahoma statutory scheme and the Montana Constitution, in which a right to be "made whole" is explicitly granted to every injured worker, cannot be overstated. The Montana Constitution is the supreme law of this State, and we are bound by its mandate. *Associated Press v. Board of Pub. Educ.*, 246 Mont. 386, 391, 804 P.2d 376, 379 (1991). Talbot's employer sent him to Montana to perform a job. While here to do his work, he was seriously injured by a third party's negligence. Talbot's action against the tortfeasor arises in Montana, and Montana has a strong tie to—and a strong interest in resolving—the underlying tort action. Cudd's intervention in the action to assert a subrogation lien directly implicates Article II, Section 16's guarantee of "full legal redress for injury incurred in employment for which another person may be liable." Because Talbot undisputedly will not be made

whole for his injuries, his "full legal redress" would be denied if his employer is allowed to obtain subrogation.

¶38 In summary, we reaffirm our decision in *Oberson* that § 185 is inapplicable in Montana and rely on § 90 of the Restatement to supplement our determination both here and in *Oberson* that, based on the exceptionally strong public policy of this State, courts in Montana will not entertain actions involving workers' compensation subrogation prior to an injured worker's full recovery. Therefore, although the District Court did not rely on the grounds under which we affirm its decision, it did not err in determining that Montana courts will not conduct a § 185 choice of law analysis when determining whether a party may attach a workers' compensation subrogation lien to an injured worker's tort recovery prior to the injured worker being made whole.

¶39 Finally, we clarify that we are comfortable categorically applying § 90 in this particular case because Cudd has stipulated that, under Montana law, "Cudd will be prohibited from asserting a subrogation interest, pursuant to Montana's 'made whole' doctrine." In other words, there is no dispute that Talbot has not been made whole by virtue of his tort recovery. Should there be, in a different case, a genuine issue as to whether an injured worker has made a full recovery such that subrogation could be permitted, then there would be no categorical application of § 90, and the extent of the worker's recovery would be an issue of fact to be resolved by the District Court.

¶40 *2. Did the District Court err in granting summary judgment in favor of Talbot?*

¶41 The issue before the District Court was solely a matter of law: whether Montana or Oklahoma law applied to either preclude or permit subrogation in the underlying tort

action. The District Court granted summary judgment in favor of Talbot and determined that Cudd's attempt to assert a workers' compensation subrogation lien was invalid under Montana law. Cudd has stipulated that, if Montana law applies, Talbot will not be made whole. Therefore, because we have held that the Montana Constitution applies in this case, and Cudd has stipulated that Talbot will not be made whole under Montana law, Talbot was entitled to summary judgment as a matter of law. For these reasons, the District Court did not err in granting summary judgment in favor of Talbot.

## CONCLUSION

¶42 For the reasons set forth in this Opinion, we hold that Montana courts will not entertain causes of action seeking to attach workers' compensation subrogation liens to an injured worker's tort recovery, prior to that party being made whole. Therefore, Talbot was entitled to summary judgment.

¶43 Accordingly, we affirm the decision of the District Court.

/S/ PATRICIA COTTER

We Concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA
/S/ MICHAEL E WHEAT
/S/ JIM RICE

Justice Laurie McKinnon, dissenting.

¶44 In my opinion, the Court follows a trail, perhaps created in *Oberson*, which misconstrues sections of the Restatement, our choice of law precedent, and well-established principles of subrogation. The underlying personal injury action in Montana is against a third-party tortfeasoror for damages. In *Phillips* we adopted §§ 6(2) and 145 of the Restatement (Second) of Conflict of Laws for tort actions explaining that "we see no reason to have one choice of law approach for contracts and another for torts." *Phillips*, ¶ 23. I see no reason to distinguish choice of law for subrogation claims from the underlying action. If, pursuant to §§ 6(2) and 145, Montana law is the appropriate choice of law for the underlying tort action, then Montana's made whole doctrine would foreclose payment of Cudd's subrogation lien until Talbot has been fully compensated for his injuries. A subrogation claim flows from the potential damages Talbot might receive in successfully prosecuting his tort action. Cudd's subrogation claim substitutes Cudd for its insured, Talbot, and arises from a potential judgment against WMK-Davis, as a result of WMK-Davis' tortious conduct within the State of Montana. Following our rejection in *Oberson* of § 185, I cannot agree with the Court's adoption of a new and inflexible rule for resolving a "choice" of law. Consistent with *Phillips*, I would apply the most significant relationship test to the underlying tort action. Montana's strong policy of requiring that an injured party be made whole before subrogating a claim, in addition to the interests of Oklahoma, would be considered in applying the §§ 6(2) and 145 factors. I would remand for such a consideration to be

22

made. If Montana law applies, no subrogation will occur unless, and until, Talbot is fully compensated for his injuries.

¶45 Under Montana law, one who asserts the right of subrogation must step into the shoes of, or be substituted for, one whose claim or debt he or she paid. *Skauge v. Mountain States Tel. & Tel. Co.*, 172 Mont. 521, 526, 565 P.2d 628, 630 (1977) ("the person substituted will succeed to the rights of the creditor in relation to the debt or claim."). *See also Mont. Petroleum Tank Release Comp. Bd. v. Capitol Indem. Co.*, 2006 MT 133, ¶ 13, 332 Mont. 352, 137 P.3d 522; *Youngblood v. American States Ins. Co.*, 262 Mont. 391, 397, 866 P.2d 203, 206 (1993). Thus, an "insurer seeking subrogation has only those rights maintained by its insured." *Nimmick v. State Farm Mutual Automobile Ins. Co.*, 270 Mont. 315, 1158, 891 P.2d 1154, 1159 (1995). In *St. Paul Fire & Marine Ins. v. Glassing*, 269 Mont. 76, 80, 887 P.2d 218, 220 (1994), we adopted language from Couch on Insurance stating:

> The right of subrogation is purely derivative as the insurer succeeds only to the rights of the insured, and no new cause of action is created. In other words, the concept of subrogation merely gives the insurer the right to prosecute the cause of action which the insured possessed against anyone legally responsible for the latter's harm, . . . .

16 Couch on Insurance 2d, § 61:37 (1983). Since an "insurer's claim is derived from that of the insured, its claim is subject to the same defenses . . . as though the action were sued upon by the insured." *St. Paul Fire & Marine Ins.*, 269 Mont. at 80, 887 P.2d at 220.

¶46 Based upon the derivative nature of a subrogation claim, I would conclude that isolating the subrogation claim from the underlying tort claim for an independent choice of law analysis is inappropriate. The subrogation claim flows from the injured party's

23

recovery of damages under a particular state's law. While a state's interest in subrogation may be relevant to deciding the choice of law for the underlying tort action, it is subsumed into consideration of the §§ 6(2) and 145 factors. As with all the Restatement factors, a state's policy regarding subrogation would be just one of the relevant factors a court would consider. Such an approach is consistent with our precedent, harmonizes *Oberson* and *Phillips*, and applies principles of subrogation and the Restatement consistently.

¶47 In *Oberson*, Musselman filed a personal injury claim in Montana and recovered a judgment against a third-party tortfeasor. *Oberson*, ¶ 6. We refused to adopt § 185 in resolving the subrogation lien of Musselman's Michigan-based employer, International, explaining that applying Michigan law to the subrogation issue would defeat Montana's strong policy of ensuring an injured party is fully compensated for his injuries. *Oberson*, ¶ 17. In declining to adopt § 185 because it was inflexible and prevented consideration of Montana's public policy, we explained that the "workers compensation context giving rise to the parties' relationship here is of no legal consequence, as the money Federated seeks flows directly from Musselman's injury in Montana, to which Montana's federal court applied Montana tort law to conclude that damages were warranted." *Oberson*, ¶ 13. Accordingly, our decision to reject § 185 in *Oberson* expressly relied upon the derivative nature of a subrogation lien. We refused to allow International to assert Michigan subrogation law in the context of an underlying tort action which had been brought by the insured in Montana and decided pursuant to Montana law. *Oberson*, ¶ 17. While much of our discussion was in the context of public policy citing at length

precedent setting forth Montana's made whole doctrine, as the Court here does as well, the analytical basis for our decision in *Oberson* was the premise that the subrogation claim flowed from damages obtained following the application of Montana law to the underlying tort action. *Oberson*, ¶ 11. Concluding the workers compensation context was of no legal consequence when the underlying tort action was controlled by Montana law, we rejected adoption of § 185 in favor of a more flexible approach which would take into consideration Montana's strong policy of precluding the subrogation of a tort award until the damaged party fully recovers. *Oberson*, ¶ 13. In contrast to these proceedings, we specifically recognized in *Oberson* that there was no countervailing public policy of another state to consider. Our analysis in *Oberson* was, therefore, incomplete inasmuch as we failed to articulate an analytical framework to be applied, following our rejection of § 185, when there are two or more competing public policy interests of different states. Significantly, in *Oberson* and here, we have left undisturbed our decision in *Phillips* where we expressly adopted the most significant relationship test as the analysis to be applied in choice of law disputes. In my view, and in contrast to the Court's decision here, we cannot have a choice of law analysis if there is no analysis and no "choice" to be considered.

¶48    We held in *Phillips* that the "most significant relationship" analysis and the factors set forth in §§ 6(2) and 145 are to be applied for determining choice of law in a tort action. *Phillips*, ¶ 23. We expressly adopted the "most significant relationship" test as the procedure for deciding choice of law issues in Montana, absent a statutory directive to the contrary, explaining that there was no reason to have different tests applied which are

25

dependent upon the type of action pursued. Indeed, should Montana law not be applied to the underlying proceeding but nonetheless applied to the subrogation issue, it is unclear how Montana's public policy is being furthered. The employer-employee relationship arose in Oklahoma and the underlying action and potential damages would be resolved through and flow from the application of another state's laws. As in *American Interstate*, it would be hard to conclude that Montana's public policy is advanced by applying our made whole doctrine to such a situation.

¶49 Moreover, we held in *Phillips* that considerations of public policy are expressly subsumed within the most significant relationship approach, referring specifically to § 6(2)(b) and (c). *Phillips*, ¶ 75. We explained that "in order to determine which state has the more significant relationship, the public policies of all interested states must be considered. [Therefore, a] 'public policy' exception to the most significant relationship test would be redundant." *Phillips*, ¶ 75. We affirmed that "Montana does not recognize a public-policy exception to the 'most significant relationship' analysis because the purpose of the analysis is to resolve conflicts between different states' competing policies[.] . . ." *Madroo v. Nationwide Mut. Fire Ins. Co.*, 2008 MT 275, ¶ 53, 345 Mont. 262, 191 P.3d 389. The Court here, however, enunciates a rule in direct contravention to *Phillips* and *Madroo* by recognizing a public policy exception to be applied only in the context of subrogation claims and without any surrounding analytical framework. Talbot is not entitled to the protections of Montana law unless the Court first determines that Montana law applies to the issues presented in the underlying tort action. There is no public policy exception to the "significant relationship test." *Phillips*, ¶ 75; *Madroo*, ¶ 53.

In order to determine the choice of law in a tort action, we must apply the factors in § 6(2) as *Phillips* requires to the underlying tort action.

¶50    Finally, in searching for support of its "choice" of law principle, the Court refers to § 90 of the Restatement. That section provides: "[n]o action will be entertained on a foreign cause of action the enforcement of which is contrary to the strong public policy of the forum." However, the scope of the section is thoroughly explained in comment (a):

> The rule of this Section has a narrow scope of application. It applies only to situations where the forum refuses to entertain the suit on the ground that the cause of action is contrary to a strong local public policy. The rule does not apply to situations where the forum does decide the controversy between the parties and, on the stated ground of public policy, applies its own local law, rather than the otherwise applicable law, in determining one or more of the issues involved.
>
> The rule of this Section does not justify striking down a defense good under the otherwise applicable law on the ground that this defense is contrary to the strong public policy of the forum. Such action involves more than a mere denial of access to the court. Rather, it is a preliminary step to rendition of a judgment on the merits. It involves application of the local law of the forum to determine the efficacy of a defense and thus to decide the ultimate rights of the parties. The Supreme Court of the United States has held that it is a violation of due process for a State to strike down a defense under a foreign law as being contrary to its public policy if the State has no reasonable relationship to the transaction and the parties. *Home Ins. Co. v. Dick*, 281 U.S. 397 (1930).

In contrast to the circumstance present in these proceedings, cases where a suit on a foreign cause of action were dismissed on public policy grounds include *Ciampittello v. Ciampitiello*, 54 A.2d 669 (Conn. 1947) (gambling), *Cerniglia v. C.&D. Farms, Inc.*, 203 So. 2d 1 (Fla. 1967) (contract against competition), and *Dorado Beach Hotel Corp. v. Jernigan*, 202 So. 2d 830 (Fla. 1967) (gambling).

27

¶51    The Court cites *American Interstate* in support of applying § 90 to these proceedings. *American Interstate* was a certified question from the federal court as follows: "Where a conflict of law issue exists in a worker's compensation subrogation claim, should sections 146 and 145, *or* section 185 of the Restatement of the Law of Conflicts govern?" *American Interstate*, 861 N.E. 2d at 522 (emphasis added). However, the Supreme Court of Ohio found that § 185 *applied*, and that the laws of the state in which the worker's compensation benefits had been paid was controlling. The court went on to explain that, within the context of § 185, "this general rule is potentially limited . . . by Section 90 of the Restatement." *American Interstate*, 861 N.E. 2d at 524. The court determined that "[a]pplying Louisiana law and allowing American Interstate to enforce its subrogation rights would not prejudice the interests of any Ohio citizens or undermine the state's public policy." *American Interstate*, 861 N.E. 2d at 529. The court observed that the "only parties with a substantive interest in the outcome of the subrogation issue . . . [were] all Louisiana citizens." *American Interstate*, 861 N.E. 2d at 529. The court concluded that "*[s]ince no Ohio party or citizen has a substantive interest in the outcome of the subrogation claims, Ohio's interest in those issues is minimal.*" *American Interstate*, 861 N.E. 2d at 529 (emphasis added). Protection of Ohio's public policy therefore did not require any further analysis of the Louisiana's worker's compensation subrogation law. Unlike the Court's decision here, in *American Interstate* the analytical framework upon which the court based its decision was § 185. Section 90 was applied as an *exception* to § 185. Moreover, in the instant proceedings, Talbot is an Oklahoma resident and there is no public policy interest *in Montana* of ensuring a

28

Louisiana resident is made whole, unless Montana law is applied to the underlying tort action. Significantly, the certified question in *American Interstate* was in the disjunctive and, after finding § 145 and the most significant relationship test inapplicable, applied § 90 only in the context of § 185. The application of § 90 in *American Interstate* mitigated the inflexibility of § 185 in choice of law disputes for subrogation claims. Ultimately, however, § 90 was not applied in *American Interstate* as an exception to § 185 because Ohio's public policy was not advanced by protecting a Louisiana worker. As we have rejected § 185, *American Interstate* offers no support for the Court's reasoning.

¶52 In my opinion, when we rejected § 185 in *Oberson* because it was "inflexible," we were left with the "most significant relationship" analysis under §§ 6(2) and 145, adopted by this Court in *Phillips*. As stated in *Phillips*, considerations of public policy of the forum state and other interested states are subsumed within the "most significant relationship" approach. Here, our decision to find an impenetrable public policy exception pursuant to § 90 replaces the inflexibility of § 185 with another inflexible rule that guarantees there will be no choice of law. Montana law will always be applied to subrogation claims regardless of what countervailing considerations may warrant and whether Montana has any connection or interest in the proceeding at all. We have never established impenetrable barriers to prevent considered thought of valid competing interests, even when they are embodied in our constitution and statutes. *See generally Krakauer v. State*, 2016 MT 230, 384 Mont. 527, 2016 Mont. LEXIS 811.

¶53 Following our rejection of § 185 in *Oberson* and based upon the derivative nature of a subrogation claim, I would hold unambiguously that the "most significant relationship" test is to be applied in resolving conflicts over the choice of law to the underlying tort action and, that the competing public policy interests of different states regarding subrogation are subsumed in the application of §§ 6(2) and 145, along with all the relevant factors in deciding the choice of law. If Montana law is the choice of law for Talbot's underlying tort action, then no subrogation will occur unless Talbot is fully compensated for his injuries.

¶54 I dissent from the Court's failure to provide a well-reasoned analytical framework for determining the choice of law in these proceedings.

/S/ LAURIE McKINNON