DA 19-0546

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2020 MT 291

ZACHARY SCOTT BUCKLES, Deceased, by and through
his Personal Representative, NICOLE R. BUCKLES, and
NICOLE R. BUCKLES, Personal Representative, on
behalf of the heirs of ZACHARY SCOTT BUCKLES,

      Plaintiffs and Appellees,

  v.

BH FLOWTEST, INC., a Montana Corporation, and
BLACK ROCK TESTING, INC., a Montana Corporation,

      Defendants and Appellants,

CONTINENTAL RESOURCES, INC., an Oklahoma
Corporation, JANSON PALMER, d/b/a/ BLACK GOLD
TESTING, and JOHN DOES I-V,

      Defendants.

APPEAL FROM:    District Court of the Seventh Judicial District,
                  In and For the County of Richland, Cause No. DV 2015-014
                  Honorable Olivia C. Rieger, Presiding Judge

COUNSEL OF RECORD:

        For Appellant Black Rock Testing, Inc.:

                Kelly J.C. Gallinger, Aaron M. Dunn, Brown Law Firm, P.C., Billings,
                Montana

        For Appellant BH Flow Testing, Inc.:

                Christopher C. Stoneback, Leonard H. Smith, David F. Knobel, Crowley
                Fleck PLLP, Billings, Montana

        For Appellees:

                A. Clifford Edwards, Edwards & Culver, Billings, Montana

                Robert J. Savage, Savage Law Firm, Sidney, Montana

Submitted on Briefs:  April 8, 2020

Decided:  November 24, 2020

Filed:

_____
                        Clerk

Justice James Jeremiah Shea delivered the Opinion of the Court.

¶1      This is a consolidated appeal in which Defendants BH Flowtest, Inc. (BH Flowtest) and Black Rock Testing, Inc. (Black Rock) appeal the August 19, 2016 and February 8, 2019 orders of the Seventh Judicial District Court, Richland County, determining Montana law applies to the wrongful death action brought by Nicole R. Buckles (Buckles) on behalf of the estate of her deceased son, Zachary Scott Buckles (Zachary), whose death occurred in the State of North Dakota.  Upon the District Court's certification as final for purposes of appeal pursuant to M. R. Civ. P. 54(b) and M. R. App. P. 6(6), we restate and address the following issue:

> *Did the District Court err in determining Montana law, not North Dakota law, governs Buckles' claims against BH Flowtest and Black Rock?*

¶2      We affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

¶3      In April 2014, Zachary died of exposure to high levels of hydrocarbon vapors while manually gauging crude oil production tanks on Continental Resources, Inc.'s Columbus Federal 2-16H well site located near Alexander, North Dakota.  The Columbus Federal 2-16H well site is part of the Bakken Reservoir and is a tank battery consisting of twenty tanks that support five production oil wells, including the Tallahassee 2016H tank number three and Tallahassee 3-16H tank number one.

¶4      On April 17, 2014, Zachary was dispatched from his residence in Glasgow, Montana, to the Columbus Federal 2-16H well site by his employer, Janson Palmer, doing business as Black Gold Testing (Black Gold) to perform manual gauging of the well site's

crude oil production tanks. Black Gold was contracted to perform manual tank gauging services for Continental pursuant to Continental's Master Service Contract with BH Flowtest, who subcontracted with Black Rock. Black Rock then subcontracted with Black Gold. BH Flowtest, Black Rock, and Black Gold are all Montana business entities. Continental is an Oklahoma corporation authorized to do business in Montana since 1990.

¶5 On March 2, 2015, Buckles, acting as personal representative of Zachary's estate, filed a complaint against Continental, BH Flowtest, Black Rock, and Black Gold in Montana's Seventh Judicial District Court, Richland County, alleging the Defendants are liable for Zachary's death.

¶6 On June 22, 2015, Black Rock filed a Motion for Declaration of Applicable Law requesting that the District Court apply North Dakota substantive law to Buckles' tort claims. BH Flowtest joined Black Rock's motion. The District Court denied the motion and determined that Montana law applies.

¶7 On November 16, 2017, Black Rock requested the District Court reconsider its decision in light of this Court's reversal and remand of the District Court's dismissal of Continental on jurisdictional grounds, *see Buckles v. Cont'l Res., Inc.*, 2017 MT 235,

4

388 Mont. 517, 402 P.3d 1213 (*Buckles I*),[1] and the issuance of an order in United States District Court for the District of Montana, *Otto v. Newfield Exp. Co.*, No. CV 15-66-BLG-SPW, 2016 U.S. Dist. LEXIS 195741, 2016 WL 9461791 (D. Mont., July 25, 2016). BH Flowtest joined the motion. On February 8, 2019, the District Court denied Black Rock's motion. This appeal followed.

## STANDARDS OF REVIEW

¶8 A district court's determination of which state's substantive law governs an action is a question of law reviewed de novo. *Hutchins v. Hutchins*, 2018 MT 275, ¶ 6, 393 Mont. 283, 430 P.3d 502 (citing *Masters Group Int'l, Inc. v. Comerica Bank*, 2015 MT 192, ¶ 33, 380 Mont. 1, 352 P.3d 1101). *See also HSBC Bank USA, N.A. v. Anderson*, 2017 MT 257, ¶ 17, 389 Mont. 106, 406 P.3d 416 ("This Court reviews decisions on choice of law de novo."). A district court's factual findings underlying its choice of law determination are reviewed for clear error. *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 14-15 (9th Cir. 2012).

---

[1] We reversed the District Court's dismissal of Continental on personal jurisdiction grounds and remanded the issue to the District Court with instructions to conduct an evidentiary hearing for the purpose of determining whether Continental is subject to specific personal jurisdiction in Montana. *Buckles I*, ¶ 29. After holding the evidentiary hearing, the District Court determined Continental was not subject to specific personal jurisdiction and entered its Findings of Fact, Conclusions of Law and Order granting Continental's motion to dismiss. Buckles again appealed, and we reversed and remanded upon determining after a review of the record that Continental was subject to personal jurisdiction in Montana. *Buckles v. Cont'l Res., Inc.*, 2020 MT 107, 400 Mont. 18, 462 P.3d 223 (*Buckles II*).

**DISCUSSION**

¶9  *Did the District Court err in determining Montana law, not North Dakota law, governs Buckles' claims against BH Flowtest and Black Rock?*

¶10  Where a conflict arises regarding which state's substantive law applies to a particular action, we apply the approach from the Restatement (Second) on Conflict of Laws. *Phillips v. GMC*, 2000 MT 55, ¶ 23, 298 Mont. 438, 995 P.2d 1002. The Restatement's conflict of laws analysis is two-part, beginning with § 6. *Talbot v. WMK-Davis, LLC*, 2016 MT 247, ¶ 23, 385 Mont. 109, 380 P.3d 823. "Section 6 first asks whether the forum state has a statutory directive concerning choice of law applicable to the underlying cause of action." *Talbot*, ¶ 23 (citing Restatement (Second) Conflict of Laws § 6(1)). If a statutory directive exists, we apply the statute and no further inquiry is necessary. *Talbot*, ¶ 23.

¶11  Where no statutory directive exists, the Court considers the principles outlined in § 6(2) with the specific section of the Restatement that is applicable to the case. *Talbot*, ¶ 23 (citing *Phillips*, ¶¶ 28-30). Section 6(2) provides:

> (2) Where there is no such directive, the factors relevant to the choice of the applicable rule of law include:
>  (a) the needs of the interstate and international systems,
>  (b) the relevant policies of the forum,
>  (c) the relevant policies of other interested states and the relative interests of those states in determination of a particular issue,
>  (d) the protection of justified expectations,
>  (e) the basic policies underlying the particular field of law,
>  (f) certainty, predictability, and uniformity of result, and
>  (g) ease in the determination and application of the law to be applied.

*Talbot*, ¶ 23. We have noted that the § 6(2) factors "provide[] a more flexible approach which permits analysis of the policies and interests underlying the particular issue before the court, and . . . that any analysis under the Restatement approach is necessarily driven by the unique facts, issues, applicable law, and jurisdictions implicated in a particular case." *Talbot*, ¶ 23 (quotations and alterations omitted). *See also Oberson v. Federated Mut. Ins. Co.*, 2005 MT 329, ¶ 13, 330 Mont. 1, 126 P.3d 459 (citations omitted) ("[I]n choice of law cases, this Court has consistently rejected rigid rules, favoring the modern trend toward a 'more flexible approach which permits analysis of the policies and interests underlying the particular issue before the court.'").

¶12 There is no statutory directive regarding choice of law in Montana for issues sounding in tort. *Phillips*, ¶ 23. Therefore, we consider the § 6(2) factors, along with §§ 145, 146, and 175 of the Restatement, all of which specifically apply to tort and personal injury actions. *Phillips*, ¶ 29. In doing so, we begin with the initial presumption stated in § 145(1), and reiterated in §§ 146 and 175, which "provide[s] that the rights and liabilities of the parties are to be determined in accordance with the law of the state where the injury occurred . . . ." Restatement (Second) on Conflict of Laws, § 145.

¶13 This presumption is not irrefutable. The place of injury is simply one of the forums whose public policies and interests in the litigation the court must consider under the factors of § 6(2). *See Phillips*, ¶ 30. The law of the state of the injury will not control if, "with respect to a particular issue, another state has a more significant relationship." *Phillips*, ¶ 32. To determine which state has the most significant relationship, we look to the factors listed in § 145(2):

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
   (a) the place where the injury occurred,
   (b) the place where the conduct causing the injury occurred,
   (c) the domicile, residence, nationality, place of incorporation, and place of business of the parties, and
   (d) the place where the relationship, if any, between the parties is centered.

*Phillips*, ¶ 29.  The contacts referenced in § 145(2) "are to be evaluated according to their relative importance with respect to the particular issue."  *Phillips*, ¶ 29.

¶14     We are also mindful of Comment e to § 146, which explains that when the injury and the conduct causing the injury occur in different states:

> The local law of the state where the personal injury occurred is most likely to be applied when the injured person has a settled relationship to that state, either because he is domiciled or resides there or because he does business there. When, however, the injured person is domiciled or resides or does business in the state where the conduct occurred, there is a greater likelihood that this state is to be the state of most significant relationship and therefore the state of the applicable law with respect to issues that would usually be determined by the local law of the state of injury.

The comment goes on to explain that the state where the conduct occurred "is even more likely to be the state of most significant relationship" when the relationship between the parties is centered in that state and the parties are domiciled, reside, or do business there. Section 146, cmt. e.

¶15     Comment b of § 175, which applies to wrongful death actions, similarly expresses these principles:

> The place where the injury occurs is the place where the force set in motion by the actor first takes effect on the person.  This place is not necessarily that where the death occurs.  Nor is it the place where the death results in pecuniary loss to the beneficiary named in the applicable death statute.

¶16    We recognized these principles in *Phillips*, when we rejected the traditional *lex loci delicti commissi* rule—or the law of the place where the wrong was committed—citing the outcome of *Alabama Great S. R.R. Co. v. Carroll*, 11 So. 803, 805 (Ala. 1892). *Phillips*, ¶ 23.  In that case, an Alabama resident employed by an Alabama company on a contract entered into in Alabama was injured in Mississippi by the negligent acts of his fellow employees. *Carroll*, 11 So. at 803-04.  Under the traditional rule, the Alabama court applied Mississippi law.  *Carroll*, 11 So. at 809.  Rejecting the traditional rule, we explained in *Phillips* that "courts following the traditional approach often choose the law of a state with no interest in the resolution of the dispute, like the choice of Mississippi law in *Carroll*." *Phillips*, ¶ 18.

¶17    The parties agree an actual conflict of law exists between applicable Montana and North Dakota statutes that is determinative of the outcome of the case.  In their briefing before this Court, the parties strongly dispute where the conduct causing the injury occurred and where the parties' relationship was centered.  The parties agree that Buckles was a Montana resident and that BH Flowtest and Black Rock are incorporated in Montana, although BH Flowtest maintains that all its business operations at the times relevant to the action were in North Dakota.  Buckles alleges that the conduct causing the injuries occurred in Montana and that the parties' relationship was centered in Montana.

¶18    Considering the § 145(2) forum factors, we determine Montana has the most significant relationship to this litigation.  Looking first at § 145(2)(a)—where the injury occurred—favors North Dakota.  The remaining three factors, however, favor Montana.

9

¶19    Considering Section 145(2)(b), regarding the place where the conduct causing the injury occurred, Buckles' estate contends he was dispatched from Montana for inherently dangerous work at an unsafe well site that was supervised, operated, and controlled from Montana. Buckles' estate further asserts that before dispatching Buckles from Montana, the defendants failed to provide him with adequate and appropriate air monitoring equipment and training regarding overexposure to hydrocarbon vapors while manually gauging oil production tanks—equipment and training mandated by federal labor laws. *See* 29 C.F.R. §§ 1910.9, 1910.132 (Implementing regulations of the Occupational Safety and Health Act of 1970, found at 29 U.S.C. 651, *et seq.*, requiring employers provide adequate personal protective equipment and training on hazards and related matters to employees). This factor favors Montana.

¶20    Section 145(2)(c) requires us to consider the domicile, residence, nationality, place of incorporation and place of business of the parties. Buckles is a resident of Montana and BH Flowtest and Black Rock are both Montana corporations, each with their principal place of business in Montana. This factor favors Montana.

¶21    Section 145(2)(d) considers where the parties' relationship is centered. Buckles was hired and compensated by Black Gold in Montana. Black Gold was contracted by Black Rock under a Montana contract governed by Montana law. Black Rock was contracted by BH Flowtest, a Montana company with its principal place of business in Montana. This final factor favors Montana.

¶22    We next consider the interests of Montana and North Dakota in light of these contacts in our analysis of the § 6(2) factors:

10

¶23    Under § 6(2)(a), we consider the needs of the interstate system.  The objectives of this factor are "to make the interstate and international systems work well," to promote "harmonious relations between states," and "to facilitate commercial intercourse between them." Section 6, cmt. d.  In *Phillips*, we explained that this first factor

> supports the application of the Restatement approach, namely the law of the state with the most significant relationship to an issue.  We believe the Restatement approach fosters harmonious relationships between states by respecting the substantive law of other states when those states have a greater interest in the determination of a particular issue litigated in a foreign jurisdiction.

*Phillips*, ¶ 35.  Montana has a strong interest in applying Montana substantive law to disputes among Montana entities and the Montana citizens with whom they contract.  The basic policies underlying Montana's strict liability and vicarious liability doctrines require a Montana employer be held liable for the torts of its independent contractors in certain circumstances.  *See Matkovic v. Shell Oil Co.*, 218 Mont. 156, 159-60, 707 P.2d 2, 4 (1985); *Beckman v. Butte-Silver Bow County*, 2000 MT 112, ¶ 12, 299 Mont. 389, 1 P.3d 348.  The harmonious relationship between Montana and North Dakota is hardly advanced by denying applicability of Montana law in such cases.  This factor therefore weighs in favor of applying Montana law in this case.

¶24    Section 6(2)(b) and (c) consider the relevant policies of the forum state and other interested states.  We have previously held that the relevant policies of the forum state, Montana, and the relevant policies of the other interested state in this case, North Dakota, "are the most important factors" in a case where the plaintiff was injured outside of his domicile state.  *Phillips*, ¶ 37.  Montana has enshrined its policy interest in protecting its injured employees in Article II, § 16 of Montana's Constitution, which provides, in relevant

part, "No person shall be deprived of [] full legal redress for injury incurred in employment for which another person may be liable . . . ." North Dakota's constitution does not provide these same constitutional protections to its employees, instead providing a general directive that "[a]ll courts shall be open, and every man for any injury done him in his lands goods, person or reputation shall have remedy by due process of law . . . ." N. D. Const. art. I, § 9.

¶25 Montana law evinces a strong policy interest in ensuring employers are held to a heightened standard when their workers engage in inherently dangerous activities, by adopting strict liability for inherently dangerous activities, *Matkovic*, 218 Mont. at 159-60, 707 P.2d at 4, and vicarious liability, *Beckman*, ¶ 12. This strong policy is especially pertinent in our analysis of this case involving Montana companies that contracted with and dispatched a Montana resident to perform work which his estate alleges was inherently dangerous and resulted in his death. Conversely, North Dakota has not adopted strict liability for workers engaged in inherently dangerous activities, *see Wirth v. Mayrath Indus.*, 278 N.W. 2d 789, at 792-93 (N.D. 1979) (declining to adopt §§ 519 and 520 of the Restatement (Second) of Torts regarding strict liability for abnormally dangerous activities), nor vicarious liability, *Fleck v. ANG Coal Gasification Co.*, 522 N.W. 2d 445, 454 (N.D. 1994).

¶26 Montana also has a strong policy interest in fairly apportioning liability among those responsible for a person's injury, as expressed in our comparative negligence statutes, §§ 27-1-702 and -703, MCA. While North Dakota has also adopted comparative liability, § 32-03.2-02, NDCC, Montana's comparative negligence statutes provide more protection

12

for injured individuals by requiring that tortfeasors who are found more than fifty-percent liable to be held jointly and severally liable, § 27-1-703(1)-(2), MCA. North Dakota's statute does not provide this protection, providing instead that "[w]hen two or more parties are found to have contributed to the injury, the liability of each party is several only, and is not joint, and each party is liable only for the amount of damages attributable to the percentage of fault of that party . . . ." Section 32-03.2-02, NDCC. In a case such as this, involving multiple defendants, Montana's joint and several liability provisions found in § 27-1-703, MCA, are more likely to advance Montana's policy interest of apportioning liability among concurrent tortfeasors.

¶27 While North Dakota has an interest in allowing for compensation for injuries that occur within its borders which are caused by the negligence of others, this interest is a general policy objective that is not nearly as strong or specific as Montana's expressed public policy of protecting workers from inherently dangerous activities and ensuring injured employees' rights to full legal redress. This factor weighs in favor of Montana when applied to Buckles' case.

¶28 The next factor we consider is § 6(2)(d), regarding the protection of justified expectations of the parties. We recognized in *Phillips* "that tort cases generally do not involve justified expectations. Particularly in the area of negligence, when parties act without giving thought to the legal consequences of their conduct or to the law to be applied, they have no justified expectations." *Phillips*, ¶ 62 (citing § 6, cmt. g.). This factor is therefore neutral with respect to Buckles' case.

¶29 Next, under § 6(2)(e), we consider the basic policies underlying the particular field of law. Comment h to § 6(2) states:

> This factor is of particular importance in situations where the policies of the interested states are largely the same but where there are nevertheless minor differences between their local law rules. In such instances, there is good reason for the court to apply the local law of that state which will best achieve the basic policy, or policies, underlying the particular field of law involved.

As observed above at ¶¶ 24–27, Montana policies differ significantly from North Dakota in tort theories of liability available to an injured individual, *see Matkovic*, 218 Mont. at 159-60, 707 P.2d at 4 (imposing strict liability for harm resulting from inherently dangerous activities); *Beckman*, ¶ 12 (imposing vicarious liability on employer for torts of subcontractors arising out of work that is inherently dangerous), and the tort remedies available to an injured individual, *see* §§ 27-1-702, -703, MCA (applying joint and several liability for joint tortfeasors). This factor is therefore inapplicable to Buckles' case.

¶30 The last two factors, § 6(2)(f) and (g), require us to consider certainty, predictability, uniformity of result, and the ease in the determination and application of the law to be applied. "These are important values in all areas of the law . . . . Predictability and uniformity of result are of particular importance in areas where the parties are likely to give advance thought to the legal consequences of their transactions." Section 6, cmt. i. Applying Montana law to a case in which Montana companies who have contracted with Montana individuals to perform work that is supervised from Montana promotes the important values of legal certainty, predictability, uniformity of result, and ease in

14

determining the applicable law. As applied to Buckles' case, these final factors weigh in favor of Montana.

¶31 BH Flowtest and Black Rock argue on appeal that the § 6(2) factors weigh in favor of application of North Dakota Law, as determined by the United States District Court for the District of Montana in *Otto*, 2016 U.S. Dist. LEXIS 195741, at *8, 2016 WL 9461791, at *___, and *Winter v. Pioneer Drilling Servs.*, CV-14-20-GF-BMM, 2015 U.S. Dist. LEXIS 175256, 2015 WL 9855923 (D. Mont., May 14, 2015). *Otto* and *Winter* are distinguishable. In *Otto* and *Winter,* no defendants were Montana corporations and no relationships were entered into between two Montanans. In *Winter*, the defendants Pioneer and Whiting were Texas and Delaware corporations, respectively, and the company that hired the deceased was a North Dakota company that was then hired by defendant Whiting in North Dakota. *Winter*, 2015 U.S. Dist. LEXIS 175256, *1, 5, 2015 WL 9855923, *___. While no direct Montana relationship existed between the *Winter* parties, there was a direct North Dakota connection, since the deceased was employed by a North Dakota business. *Winter*, 2015 U.S. Dist. LEXIS 175256, *1, 5, 2015 WL 9855923, *___.

¶32 Similarly, in *Otto*, no direct Montana relationship existed between the parties. Defendant Newfield was a Texas corporation operating internationally. *Otto*, 2016 U.S. Dist. LEXIS 195741, at *2, 2016 WL 9461791, at *___. Newfield contracted with Enserco Energy, LLC to purchase the oil produced from its North Dakota wells, and the company that hired the deceased, Falco Energy, was contracted to transport the oil from the well sites to the ultimate purchaser of the oil.

15

2016 U.S. Dist. LEXIS 195741, at *2, 2016 WL 9461791, at *___. Defendant Newfield had few, if any, identified Montana duties.

¶33 The only similarity shared by *Otto* and *Winter* and Buckles' case is that the injury occurred in North Dakota. The conduct and relationship of the parties in *Otto* or in *Winter* was not centered in Montana, like in this case. Thus, *Otto* and *Winter* are inapposite to the present case.

**CONCLUSION**

After reviewing the seven factors of § 6(2) in light of the forum contacts of § 145(2), we find no clear error in the District Court's conclusion that although the injury occurred outside of Montana, Montana has the most significant relationship to this litigation. Affirmed.

/S/ JAMES JEREMIAH SHEA

We Concur:

/S/ MIKE McGRATH
/S/ DIRK M. SANDEFUR
/S/ INGRID GUSTAFSON

Justice Laurie McKinnon, dissenting.

¶35 I dissent.

¶36 The Court strains to apply what would otherwise be an ordered approach of the Restatement (Second) of Conflict of Laws, adopted by this Court in *Phillips*. In *Phillips*, we rejected the traditional choice of law rule, known as *lex loci delicti commissi* (or law of the place where the wrong was committed), recognizing that the "public policy exception

16

to the [rule] allows courts to avoid the law of the place of injury by concluding that it violates the public policy of the forum." *Phillips*, ¶ 19. We described the public policy exception to the traditional rule as an "escape device" used by courts to impose their choice of law to "avoid results perceived to be arbitrary or unfair . . . [by the forum court]," here Montana. *Phillips*, ¶ 19. We recognized that in addition to the policy exception avoiding results the forum court deems are unfair, it also produced inconsistent and unpredictable outcomes. *Phillips*, ¶ 19. We adopted, instead, the Restatement's "most significant relationship" test.

¶37 The Court properly recognizes the presumption under §§ 146 and 175 of the Restatement that North Dakota law applies to this personal injury and wrongful death action unless Montana has a "more significant relationship." Opinion, ¶ 13. The existence or lack of such a relationship is determined by applying the factors in § 145, which in turn requires application of § 6(2). *Phillips*, ¶ 29. We noted in *Phillips* that "many appellate courts" analyzed the factors "in a fairly conclusory fashion." *Phillips*, ¶ 26. We took a "somewhat tedious" path to avoid a similar conclusory analysis and evaluated, in detail, each of the § 6(2) Restatement factors in light of "the unique facts, issues, applicable law, and jurisdictions implicated in" the case. *Phillips*, ¶ 26. Except for factors (b) and (c) of § 6(2)—relevant policies of the forum and of other interested states—the Court today dispenses with the other factors in a fairly conclusory fashion. Further examination of those factors with focus on the facts and issues in this case leads to a different conclusion.

¶38 As examples of the Court's conclusory discussion, I note its reference to *Phillips* for § 6(2)(a)'s objectives of making "interstate . . . systems work well," promoting

17

"harmonious relations between states," and "facilitat[ing] commercial intercourse between them," but dismisses this factor with two sentences. Observing that certain circumstances allow a Montana employer to be liable for the torts of its independent contractors, the Court concludes, in cursory fashion, that denying applicability of Montana law in those cases "hardly advance[s]" the relationship between Montana and North Dakota. Opinion, ¶ 23. Considering subsections (f) and (g) together in one conclusory sentence, the Court states that certainty, predictability, uniformity of result, and ease in determination and application of the law are promoted by applying Montana law, when a Montana company, has contracted with a Montana resident, to perform work supervised from Montana. Opinion, ¶ 30. Moreover, the Court's focus centers almost exclusively on the citizenship or domiciliary of the parties and Montana's interest in protecting its citizens. Residency or conduct of business in Montana are, as we held in *Buckles II*, vital considerations in determining personal jurisdiction. But the focus is broader in a choice of law analysis. Determining the substantive law applicable to the case is informed by the particular issue in the case and which state's interests are greater respecting that issue.

¶39    The Court's decision today means that North Dakota law could never apply to well sites in North Dakota if a citizen from Montana, or potentially another state or foreign country, was working on the well site. The resulting inconsistencies, uncertainties, and potential harm are obvious. Operators and owners of North Dakota well sites cannot possibly, under traditional notions of fairness, comply with the laws of all 50 states and foreign countries, depending on the citizenship or domiciliary of any worker who has entered into contracts to perform work on the well site. The Court does not address the

18

inconsistencies and uncertainties which will inevitably occur when Montana law, North Dakota law, and other forums' laws are applied to the same workers, injured by the same negligent conduct, at the same worksite, in the same state. Applying Montana workplace safety law to a North Dakota workplace is inconsistent with *Phillips* and the Restatement's "most significant relationship" test.

¶40 Buckles' Complaint includes three causes of action: negligence, negligent infliction of emotional distress, and loss of consortium. Buckles alleges that defendants "failed to maintain a safe oil well site and secure work area on the oil well site pursuant to [the] contract and in fact," and defendants allowed "an inherently dangerous and unsafe well site to be operated, which did not have adequate or appropriate air monitoring equipment in place to protect [Buckles] from over exposure to hydrocarbon vapors . . . ." These are all acts which occurred within North Dakota. The well was located in North Dakota; the work area was located in North Dakota; the services and work performed were located in North Dakota; the alleged inadequate and inappropriate air monitoring equipment was located on the well site in North Dakota; and the events leading to Buckles' death occurred in North Dakota. Buckles' single principal claim essentially is that conditions at the well site were unsafe. That issue must be the focus of consideration for each of the Restatement factors.

¶41 To determine whether Montana has a more significant relationship, §§ 145 and 175 of the Restatement must be considered. First, considering § 145, both Buckles' injuries and the conduct that caused his injuries occurred in North Dakota. The place where the injury occurred—§ 145(2)(a)—is, as discussed above, central because it is the safety of *that place* that is the issue in the case. The place where the conduct causing the injury

19

occurred—§ 145(2)(b)—also favors North Dakota as the more significant interest, because any failures to provide a safe worksite or proper safety measures or equipment at that site are more likely to have occurred where the well is located. While Buckles was a resident of Montana—§ 145(2)(c)—he was living in North Dakota at the time of his death and while working intermittent periods for several weeks. Also, BH Flowtest and Black Rock are incorporated in Montana, while Continental is incorporated in Oklahoma. Accordingly, the Defendants are residents of both Montana and Oklahoma, but all Defendants and Buckles were conducting business in North Dakota. Restatement (Second) § 145(2)(c).

¶42 Finally, addressing § 145(2)(d), the connection between the parties was the common objective of producing and exploring oil and gas on a North Dakota well site. Buckles subcontracted with Black Gold to perform work in North Dakota. Through a series of multi-tiered subcontractor contracts, Buckles and the other independent contractors had a relationship which was focused on oil production in North Dakota. Thus, the parties' relationship is "centered" around the well site in North Dakota. Restatement (Second) § 145(2)(d); *see also Otto*, 2016 U.S. Dist. LEXIS 195741, *13. The § 145 factors, considered collectively, weigh in favor of applying North Dakota law.

¶43 Next, the § 6 factors must be considered. In this case, the location of the injury is a very important consideration for all of the factors, with the exception of perhaps (d)—"the protection of justified expectations."[1] The remaining § 6 factors include: (a) the needs of

---

[1] We recognized in *Phillips* that tort cases, particularly in the area of negligence, do not normally involve justified expectations of the parties. *Phillips*, ¶ 62. On this factor, I agree with the Court's resolution that it is neutral. Opinion, ¶ 28.

interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relevant interests of those states in the determination of the particular issue; (e) the basic policies underlying the particular field of law; (f) certainty, predictability and uniformity of result; and (g) ease in the determination and application of the law to be applied. Because the significance of the location of injury is inextricably tied to consideration of all the Restatement factors, my discussion focuses on location of the injury and the factors as a whole. This is appropriate given that location of the injury, under the facts present here, logically support the Restatement's presumption that arises in favor of North Dakota law. This contrasts to the facts and the nature of the action in *Phillips*, a products liability case. *Phillips* emphasized the purpose of products liability laws is to "regulate purchases made within [the state's] borders and to protect and compensate its residents." *Phillips*, ¶ 60. In contrast, the action here is based on negligence allegedly occurring on a North Dakota worksite.

¶44 North Dakota, as Judge Morris recognized in *Winter*, 2015 U.S. Dist. LEXIS 175256, *6, "possesses a significant interest in regulating businesses that extract natural resources within its boundaries." Commercial intercourse between states involved in multistate industries like oil and gas development is more likely to be facilitated when a commercial operator may rely on the law and regulations of the state in which the well is located instead of having to research and comply with multiple states' regulations on the possibility that individuals from different states will cross state lines to work on different wells. Unlike the typical "fortuitous" location of many tort cases, the site of injury here is the focus of dispute. Both Montana and North Dakota have policy interests in protecting

21

the health and safety of their workers and ensuring adequate compensation for work-related injuries. However, North Dakota has a significantly stronger interest in the safety of its worksite located within its boundaries. It has the additional significant policy interest of encouraging and promoting oil and gas production in North Dakota. These interests weigh in favor of applying North Dakota's substantive law.

¶45 We observed in *Phillips* that ". . . [p]redictability and uniformity of result are of particular importance in areas where parties are likely to give advance thought to the legal consequences of their transactions." *Phillips*, ¶ 68 (quoting Restatement (Second) § 6(2) cmt. i.). At least one purpose of laws regulating oil and gas development is to provide appropriate safety to avoid dangerous conditions and to deter future accidents. When contracting for work on the site, both parties in the relationship are likely to give advance thought to the conditions at the site and the requirements for performing the job. This may be less likely if the worker is an employee sent to work at a location of the employer's choosing, but an independent contractor presumably gives some thought to where he chooses to do business. Again, having one well site subject to innumerable states' laws, depending on the citizenship of each worker on the site, does not promote harmonious relationships, predictability, uniformity, or ease of application of law. In fact, it seems like a mess.

¶46 The Court concludes that Montana has an interest in ensuring that Montana residents are better and more easily compensated when they voluntarily work out-of-state. However, even assuming the validity of this interest, it does not take priority over North Dakota's interest in ensuring the safety of its well sites and promoting development of oil and gas

22

for its citizens. "The Legislative Assembly of North Dakota has specifically declared that the development and production of oil and gas is in the public interest." *Paradigm Energy Partners, LLC v. Fox*, 2016 U.S. Dist. LEXIS 189097, 17 (D.N.D. 2016). In particular, § 38-08-01, N.D.C.C., provides that it is "in the public interest to foster, to encourage, and to promote the development, production, and utilization of natural resources of oil and gas in [North Dakota]." North Dakota law also provides that "[t]he State of North Dakota, exercising its police and sovereign powers, declares that the prosperity of the state depends in a large measure upon the well-being of its wageworkers. . . ." Section 65-01-01, N.D.C.C. North Dakota has a significant interest in regulating and promoting oil and gas production in its state, together with monitoring the safety of workplaces which ensure successful production. North Dakota's interest in regulating its petroleum industry would be severely hampered if other state laws could be applied to its worksites. Here, the parties are connected and present in North Dakota only because of their mutual interest in the production of oil and gas in North Dakota oil fields.

¶47    The Restatement provides that in a world "composed of territorial states having separate and differing systems of law. . . , [e]vents and transactions occur, and issues arise, that may have a significant relationship to more than one state, making necessary a special body of rules and methods for ordering and resolution." Restatement (Second) of Conflict of Laws, § 1 (1971). In my opinion, the Court has skewed this "special body of rules," which we expressly adopted in *Phillips*, because it perceives an unfair result to the Buckles' Estate if North Dakota law is applied. However, the fact that Montana law may provide a plaintiff with a better chance of higher damages is an insufficient basis to resolve choice

23

of law disputes. In *Simmons v. State*, 206 Mont. 264, 286, 670 P.3d 1372, 1383 (1983), this Court observed that "predicating jurisdiction on which forum provides the highest possible damage award would be conductive to the unacceptable practice of 'forum shopping.'" Predicating which state laws would apply based on what would be better for a plaintiff would promote forum shopping, just as it has done here. While the most "significant relationship to the occurrence and parties" is a fluid approach which factors in consideration of the policies of each state, the presumption in favor of applying North Dakota law cannot be rebutted on the basis that Montana could provide for higher damages. The Court's decision rests on Buckles' ability as a Montana citizen to recover, under Montana law, potentially higher damages. Citizenship and higher damages do not overcome the presumption in favor of applying North Dakota law.

¶48    Here, the Court acknowledges the negligence claims arise out of injuries that took place on an allegedly unsafe well site located in North Dakota, but nonetheless concludes the presumption in favor of North Dakota law is rebutted by Montana's "strong policy interest" in protecting Montana citizens who are injured out-of-state. The Court elevates Montana's policy over that of North Dakota's, referring to policy as "the most important factor."[2] Here, it is not as if North Dakota has no policy to protect its workforce, it does—

_____

[2] To be clear, we stated in *Phillips* that the relevant policies of the forum state and other interested states *"[i]n the case sub judice*, . . . are the most important factors in the analysis." *Phillips*, ¶ 37 (emphasis added). However, *Phillips* was a product liability case where the only connection to Kansas was that the accident involving the defective vehicle occurred on a Kansas roadway. We noted the "purpose of a state's product liability statute is to regulate the sale of products *in that state* and to prevent injuries incurred by that *state's residents* due to defective products." *Phillips,* ¶ 39. Thus, Kansas' product liability law's purpose "is to establish the level of safety of products sold either in Kansas or to a Kansas resident." *Phillips*, ¶ 40. Because the vehicle was neither

it is just not Montana's policy. The Court cites the unwillingness of North Dakota to adopt strict liability for inherently dangerous activities *occurring in North Dakota workplaces* as "especially pertinent [to] our analysis."[3] Opinion, ¶ 25. The Court also refers to North Dakota's comparative negligence statutes as not being equal to Montana's comparative negligence statutes because North Dakota does not require tortfeasors to be held jointly and severally liable when the tortfeasor is more than fifty-percent liable. Again, it is not as if North Dakota does not have a policy to address negligence in North Dakota workplaces, it does—it is just not Montana's policy. Our conclusion that the presumption in favor of the place of injury is rebutted by Montana's "strong policy interest" ignores the overwhelming predominance of other considerations identified in the relevant Restatement sections which weigh against applying Montana law. Here, the presumption in favor of applying the law of the place of injury is actually *strengthened* by the following significant facts: Buckles' death occurred in North Dakota; the alleged unsafe worksite was located in North Dakota; North Dakota has a significant interest in the safety of workplaces located within its boundaries; and the relationship of all the parties was centered around operation of the North Dakota well site.

¶49    As an additional consideration, apart from §§ 6 and 145 factors, it is a violation of Due Process to apply Montana laws to BH Flowtest and Black Rock Testing based on the

---

sold in Kansas nor involved a Kansas resident, Kansas had no interest in seeing its product liability law enforced.

[3] It is worth noting that Montana law has not addressed or spoken to whether operation and maintenance of a well site is an inherently dangerous activity.

alleged supervision and control of Buckles by Continental purportedly taking place from a Montana office. Even assuming Continental engaged in "Montana supervision and control" of Buckles, that does not establish Montana law should be applied to other defendants who did not supervise Buckles and who can only be described as independent contractors. In fact, the contract between BH Flowtest and Black Rock testing provided that *North Dakota law would govern* the parties' agreement. While Buckles relies on contractual relationships to establish the parties' relationship is centered in Montana, a contract governing a commercial relationship between the parties "has no bearing on a choice of law analysis based in tort." *Sura v. National Oilwell Varco, L.P.*, 2016 U.S. Dist. LEXIS 183443, *3 (D.N.D. 2016).[4]

¶50   Finally, this case cannot legitimately be distinguished from *Otto* and *Winter*, as the Court attempts to do by resting its distinction on citizenship of the parties. In both *Otto* and *Winter*, as here, negligence claims arose from the death of a Montana resident who was working for companies doing business in the North Dakota oil fields. In *Otto* and *Winter*, the choice of law favoring the place of injury was not rebutted by considerations that are identical to those at play here. The Court attempts to distinguish *Otto* and *Winter* on the basis that two of the defendants here are Montana corporations, which gives rise to "a direct Montana relationship"; whereas the defendants in *Otto* and *Winter* were not Montana corporations. Opinion, ¶¶ 31-33. However, aside from contracts governing commercial

---

[4] We applied a contractual choice of law provision to encompass a party's tort claims in *Masters Group v. Comerica Bank*, 2015 MT 192, ¶ 61, 380 Mont. 1, 352 P.3d 1101. Here, however, there was no provision in the contract requiring a particular state's law to apply.

relationships that do not control the choice of law here, the Court does not explain how its "direct Montana relationship" distinguishes, for example, Continental from the defendant corporations in *Otto* and *Winter*, which, like Continental, were not incorporated in Montana but were conducting business in Montana. Again, between these defendants and in future choice of law disputes, the net result of the Court's decision will be uncertainty, unpredictability, and a lack of uniformity. While "the place where the relationship, if any, between the parties is centered" is a consideration under § 145(d), the "direct Montana relationship" coined by the Court is not "centered" in Montana. The contractual relationship based on multiple layers of independent contractor agreements is not an "issue in tort" which is relevant to the rights and liabilities of the parties in resolving the instant personal injury litigation. *See* Restatement (Second) § 145(1) ("The rights and liabilities of the parties with respect to an *issue in tort* are determined by the local law of the state which, *with respect to that issue, . . .*"); § 146 (" . . . the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with *respect to the particular issue . . .*"); § 175 ("In an action for wrongful death, the local law of the state where the injury occurred determined the rights and liabilities of the parties unless, with respect to the *particular issue . . .*"). Here, the "issue in tort" is the alleged negligent maintenance of a well site. The fact that some of the defendants are Montana corporations has little, if any, relevance to Buckles' tort claims of negligently maintaining a well site *in* North Dakota. In my opinion, *Otto* and *Winter* correctly analyze the "most significant relationship to the occurrence and the parties," and both federal district courts arrived at

27

the same conclusion under the same identical facts as here—that the presumption in favor of applying North Dakota law had not been rebutted.

¶51 When collectively considering the §§ 6 and 145 factors, consistent with the applicable presumption of §§ 145 and 175, I would conclude that Montana's relationship to the litigation based on a contract, which memorializes a multi-tiered subcontractor relationship, cannot overcome application of North Dakota law to a tort occurring within its state. North Dakota is not just the place where the injury occurred, it is the focus of the parties' relationship; the place where the alleged conduct occurred which gives rise to this litigation and tort; North Dakota has a significant interest in maintaining control over the safety and monitoring of worksites located within its borders; and North Dakota has a significant interest in promoting and encouraging oil and gas exploration within its borders. I would hold that North Dakota has the "most significant relationship" to this dispute and that Buckles has not overcome the presumption in favor of applying North Dakota law. I dissent from the Court's decision concluding otherwise.


/S/ LAURIE McKINNON


Justices Beth Baker and Jim Rice join in the Dissent of Justice Laurie McKinnon.


/S/ BETH BAKER
/S/ JIM RICE